Louise Ann Fernandez, Esq. – State Bar No. 86263
Email: laf@jmbm.com
An Nguyen Ruda, Esq. – State Bar No. 215453
Email: ahn@jmbm.com
JEFFER MANGELS BUTLER & MITCHELL LLP
2 Embarcadero Center, 5th Floor
San Francisco, CA 94111
Telephone: (415) 984-9613
Facsimile: (310) 712-3364

Benjamin Davidson, Esq. – State Bar No. 241859
Email: bdavidson@bendavidsonlaw.com
LAW OFFICES OF BENJAMIN DAVIDSON, P.C.
9107 Wilshire Boulevard, Suite 450
Beverly Hills, CA 90210
Telephone: (310) 623-4423
Facsimile: (310) 432-0104

Attorneys for Plaintiff
ARTEC GROUP, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ARTEC GROUP, INC., a California Corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>ANDREY KLIMOV, an individual; YULIA KLIMOVA, an individual; ANNA STEBLEVA, an individual; A-STAR LLC, a Russian company; ID-WISE SIA, a Latvian company; and AXON BUSINESS SYSTEMS, LLC, a United Arab Emirates company,<br><br>    Defendants. | Case No. 5:15-CV-03449-RMW<br><br>[Assigned for all purposes to the Hon. Ronald M. Whyte]<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR**<br><br>1. **Violation of Uniform Trade Secrets Act (Civil Code §§ 3426, et seq.);**<br>2. **Breach of Employment Contract;**<br>3. **Breach of Confidentiality Agreement;**<br>4. **Breach of Distributor Agreement;**<br>5. **Unjust Enrichment;**<br>6. **Breach of Implied Covenant of Good Faith and Fair Dealing (Individuals);**<br>7. **Breach of Implied Covenant of Good Faith and Fair Dealing (Axon);**<br>8. **Tortious Interference with Contract;**<br>9. **Conversion;**<br>10. **Fraudulent Concealment;**<br>11. **Breach of Fiduciary Duty;**<br>12. **Breach of Duty of Loyalty (Labor Code §§ 2860, 2863);**<br>13. **Civil Conspiracy;**<br>14. **Constructive Trust;**<br>15. **False Advertising (Business & Professions Code § 17500);** |

| | |
|---|---|
| 1 | ) **16. Unfair Competition (Bus. & Profs.** |
| | ) **Code §§ 17200, et seq.); and** |
| 2 | ) **17. Violation of Cal. Penal Code § 502** |
| | ) |
| 3 | ) **JURY TRIAL DEMANDED** |
| | ) |
| 4 | ) Complaint filed July 27, 2015 |
| 5 | ) |

6    Plaintiff ARTEC GROUP, INC. for its complaint against Defendants ANDREY

7   KLIMOV, an individual; YULIA KLIMOVA, an individual; ANNA STEBLEVA, an

8   individual; A-STAR LLC, a Russian Limited Liability Company; ID-WISE SIA, a Latvian

9   company; and AXON BUSINESS SYSTEMS, LLC, a United Arab Emirates Limited

10   Liability Company, states as follows:

11                                     **I.      PARTIES.**

12   **A.      Plaintiff Artec Group, Inc.**

13    1.    Plaintiff Artec Group, Inc. ("ARTEC" or "ARTEC CALIFORNIA") is an

14   active California corporation founded in 2006 with its principal place of business in Palo

15   Alto, California.  ARTEC was the first-founded of the "Artec Group of Companies," three

16   affiliated corporations located in the United States, Luxembourg, and Russia.  The Artec

17   Group of Companies (collectively referred to as the "ARTEC GROUP") specializes in the

18   design, manufacture, and sale of proprietary facial recognition devices, 3D scanners,

19   technology, systems, and components thereof, including software (the "DEVICES"), to

20   domestic and international governmental and corporate clients.  In 2014, ARTEC

21   GROUP's industry-leading software was selected to perform a 3D scan on President

22   Barack Obama, whose likeness was then "printed out" via 3D printer and exhibited in the

23   Smithsonian Museum.[1]

24    2.    As relevant to this lawsuit, over several years, including in 2014 and early 2015

25   (and continuing), ARTEC GROUP had developed prototypes for two next-generation devices.

26

27   _____

28    [1] See "President Obama in 3D," available at
www.artec3d.com/news/President+Obama+in+3D_29953 (last retrieved July 16, 2015).

The first is an access control or "intercom" system whereby an individual's facial profile is matched with an existing database.  Individuals who are "recognized" by the scanning software are granted access to a secured location, while non-recognized individuals must undergo secondary screening or are denied access.  The second is a wireless 3D scanner, which would be easier to use and more flexible than the pre-existing scanners that required "wired" connections to a computer terminal.

3.      The software, source code, drawings, and specifications of these prototypes were closely guarded trade secrets of ARTEC GROUP that were in the possession of ARTEC. As alleged herein, those trade secrets were secretly misappropriated by disgruntled then-CEO Andrey Klimov in collaboration with a group of rogue employees, who are now actively and unabashedly competing against ARTEC under the guise of ID-Wise SIA, A-Star, LLC and other shell corporations, relying on the very trade secrets that ARTEC paid them to protect and develop.

4.      ARTEC has standing to pursue these claims because at all relevant times it lawfully possessed the trade secrets at issue and is the party from whom the Defendants misappropriated the trade secrets, as follows:

a.      ARTEC, individually and in concert with the subsequently incorporated ARTEC GROUP affiliates, developed the trade secrets.

b.      Until April 2014, ARTEC was the sole owner of ARTEC GROUP intellectual property and trade secrets.  Pursuant to a technology and software licensing agreement of February 1, 2011, ARTEC provided ARTEC Europe, S.a.r.l., with a nonexclusive license to certain technology, including trade secrets, related to 3D scanning and 3D face recognition.  Under the February 1st agreement, ARTEC Europe was authorized to use, manufacture, improve upon, and enhance the ARTEC GROUP Devices, and sell such devices worldwide, except in the United States.

c.      In April 2014, ARTEC assigned its patents and related know-how, technology and proprietary information to Artec Europe.

d.      On March 1, 2015, ARTEC Europe, S.a.r.l. provided ARTEC with a nonexclusive license to certain technology, including trade secrets, related to 3D scanning and 3D face recognition.  Under the March 1st agreement, ARTEC was authorized to use, manufacture, improve upon, and enhance the ARTEC GROUP Devices, and sell such devices in the United States and elsewhere.

**B.      Individual Defendants.**

5.      ARTEC is informed and believes, and on that basis alleges, that Defendant Andrey Klimov ("KLIMOV") is a citizen of Russia who was residing in Luxembourg when this lawsuit was filed and is now residing in Russia.  KLIMOV is a former Director and Chief Executive Officer of ARTEC, as well as a 29.5% shareholder in the Company. KLIMOV was at all times a trusted agent of ARTEC by virtue of his executive position, and received valuable consideration from ARTEC in exchange for the discharge of his duties. He was removed from his position as Director and Chief Executive Officer of ARTEC on February 12, 2015 immediately after ARTEC discovered that he and other ARTEC trusted agents and employees had conspired to misappropriate, and had misappropriated, ARTEC's Trade Secrets[2] and Confidential Information for the purpose of competing directly against ARTEC in the market of 3D facial recognition technology and to develop their own intercom system dependent on ARTEC's proprietary prototypes.

6.      Based on official sources, KLIMOV is the founder and sole shareholder of A-STAR,[3] as well as its General Director.  Also based on official sources, KLIMOV is the

_____

[2] As used herein, the term "Trade Secrets" has the same meaning as stated in Civil Code section 3426.1(d).  The term "Confidential Information" has the same meaning as set forth in Section 1.1 of ARTEC's Noncompetition, Confidentiality, Inventions Agreement ("NCIA") with each of its employees (see footnote 14, *infra*), except that with respect to allegations against AXON, the term "Confidential Information" has the meaning stated in Section 1.1 the Non-Exclusive Distribution Agreement between ARTEC and AXON (see footnote 15, *infra).*

[3] When the underlying Complaint was filed, KLIMOV was listed as the 51% shareholder of A-STAR according to official Russian sources, with the other 49% belonging to other former ARTEC and AGC officers and employees. For example, Defendants KLIMOVA and STEBLEVA were 2% and 5% shareholders in A-STAR, respectively.  However, according to a recent extract from Russia's Unified State Register

1  sole Board Member and shareholder of ID-WISE.  Both A-STAR and ID-WISE were

2  formed while KLIMOV was an employee, officer, and director at ARTEC.  As alleged

3  herein, both A-STAR and ID-WISE were formed as vehicles through which KLIMOV and

4  other DEFENDANTS could, and actually did, unlawfully compete against ARTEC.[4]

5         7.      ARTEC is informed and believes, and on that basis alleges, that Defendant

6  Yulia Klimova ("KLIMOVA"), is a citizen of Russia was residing in Luxembourg when

7  this lawsuit was filed and is now residing in Russia.  KLIMOV and KLIMOVA are

8  husband and wife.  KLIMOVA was employed by ARTEC, including as the de facto Chief

9  Financial Officer and Legal and Financial Consultant, from approximately April 1, 2009

10  until her relationship with ARTEC was terminated on or about February 12, 2015 due to

11  her participation in the unlawful conspiracy alleged herein.  KLIMOVA was a trusted

12  agent of ARTEC, exemplified by her communications with ARTEC's California IP

13  counsel and financial advisors, her authority to review legal billing, her oversight of

14  corporate compliance, and her ensuring that employee agreements were executed.  She

15  received valuable consideration from ARTEC in exchange for the discharge of her duties.

16  On information and belief, KLIMOVA is and has at all relevant times been an employee or

17  agent of A-STAR and ID-WISE, and in fact was listed as a co-founder and shareholder of

18  A-STAR while serving as an employee and trusted agent of ARTEC.  On information and

19  belief, KLIMOVA oversees and manages the finances and contractual relationships

20  (including employment or service relationships involving ARTEC's former employees) of

21  ID-WISE and A-STAR.

22

23  _____
    of Legal Entities, KLIMOV is now the sole shareholder of A-Star as well as its lone
24  "incorporator" and director.  ARTEC alleges that A-STAR is KLIMOV's alter ego, and
    vice versa.

25      [4] KLIMOV is also the sole shareholder and general director of another shell
26  corporation, Sense Technology LLC (former "Artec 3D," a Russian entity that KLIMOV
    secretly founded apparently to deceive ARTEC's distributors and suppliers into thinking it
    was an ARTEC GROUP company) through which he is engaged in sales of EnterFace 3D
27  devices. ARTEC is informed and believes that KLIMOVA and STEBLEVA are both
    involved in the sale of unlawful EnterFace 3D devices on behalf of Sense Technology as
28  well as ID-WISE.

8.      ARTEC is informed and believes, and on that basis alleges, that Defendant Anna Stebleva ("STEBLEVA") is a citizen of Russia who was residing in Luxembourg when this lawsuit was filed and currently has residences both in Russia and in Luxembourg.  STEBLEVA was employed by ARTEC, including as a Vice President of Business Development and Marketing Specialist, starting from approximately April 1, 2009 until her relationship with ARTEC was terminated on or about February 12, 2015 due to her participation in the unlawful conspiracy alleged herein.  STEBLEVA was a trusted agent of ARTEC, exemplified by her ability to enter into contracts and vendor and distributor relationships on behalf of ARTEC.  She received valuable consideration from ARTEC in exchange for the discharge of her duties.  On information and belief, STEBLEVA is and has at all relevant times been an employee or agent of A-STAR and ID-WISE, and in fact was listed as a co-founder and shareholder of A-STAR while serving as an employee and trusted agent of ARTEC.

9.      KLIMOV, KLIMOVA, and STEBLEVA are collectively referred to herein as the "INDIVIDUAL DEFENDANTS."

**C.      Corporate Defendants.**

10.      ARTEC is informed and believes, and on that basis alleges, that Defendant A-Star LLC ("A-STAR") is a Russian limited liability company with its principal place of business in Moscow, Russia.  A-STAR's founding documents state that it was incorporated on December 22, 2014, while the INDIVIDUAL DEFENDANTS were all actively employed by ARTEC and its trusted agents.  Each of the INDIVIDUAL DEFENDANTS was initially listed as a shareholder and founder, with KLIMOV a majority shareholder (51%).  However, based on an extract from Russia's Unified State Register of Legal Entities dated January 5, 2016, KLIMOV is now the sole shareholder of A-STAR, as well as its General Director and sole incorporator.

11.      As alleged herein, A-STAR competed directly against ARTEC, relying on misappropriated ARTEC GROUP Trade Secrets and/or Confidential Information, during the time in which KLIMOV and other shareholders were actively employed by ARTEC,

**FIRST AMENDED COMPLAINT FOR DAMAGES**
15-cv-03449-HRL

1  including by entering into a secret agreement with AXON, a longstanding ARTEC

2  distributor, for the sale of 112 of ARTEC's Broadway 3D devices for $819,273 (below

3  ARTEC's set wholesale prices).  The revenues for this sale were not given to ARTEC nor

4  did A-STAR compensate ARTEC for the devices that it unlawfully stole or replicated.

5      12.    On information and belief, A-STAR is the alter ego of KLIMOV, and vice

6  versa, as alleged *infra* in paragraphs 40 to 41.

7      13.    ARTEC is informed and believes, and on that basis alleges, that Defendant

8  ID-Wise SIA ("ID-WISE") is a Latvian company incorporated on January 22, 2015 with

9  its principal place of business in Latvia.

10      14.    According to official sources, KLIMOV is ID-WISE's sole Board Member

11  and its lone shareholder, as well as its General Director.[5]

12      15.    On information and belief, ID-WISE unlawfully competed directly against

13  ARTEC, relying on misappropriated ARTEC GROUP Trade Secrets and/or Confidential

14  Information in the lawful possession of ARTEC, during the time in which KLIMOV was

15  ARTEC's employee, director, and CEO.  ID-WISE continues to unlawfully compete

16  against ARTEC, including through its Thor3D Scanner and EnterFace 3D product lines

17  that rely on ARTEC's trade secrets.

18      16.    Each of the INDIVIDUAL DEFENDANTS acted as ID-WISE's employees

19  or agents while they were working for ARTEC and acting as its trusted agents.

20      17.    ID-WISE has marketed, advertised for sale and, on information and belief,

21  actually sold multiple devices that incorporate or rely upon ARTEC's trade secrets.  It has

22  actively promoted its unlawful products to ARTEC's United States and California

23  distributors, demonstrating its intent to compete against ARTEC locally.

24      18.    On information and belief, ID-WISE is the alter ego of KLIMOV, and vice

25  versa, as alleged *infra* in paragraphs 50 to 51.

26

27      [5] However in a subsequent correspondence from ID-WISE's counsel on June 15,
2015, it was represented that KLIMOV, as well as KLIMOVA and STEBLEVA are "co-

28  founders and shareholders" of ID-WISE.

FIRST AMENDED COMPLAINT FOR DAMAGES
15-cv-03449-HRL

19.     ARTEC is informed and believes, and on that basis alleges, that Defendant Axon Business Systems LLC ("AXON") is a United Arab Emirates limited liability company with its principal place of business in Dubai, UAE.  On information and belief, AXON conducts business worldwide, including in the United States.

20.     As relevant to this Complaint, on August 8, 2012, ARTEC and AXON entered into a "Non-Exclusive Distribution Agreement," through which AXON agreed to be the distributor of ARTEC's devices in the UAE, and also agreed *inter alia* that as a continuing obligation it would protect ARTEC GROUP Trade Secrets and Confidential Information, would not sell ARTEC GROUP Devices without ARTEC's authorization, and would report any suspected acts of infringement to ARTEC.  In breach of this agreement, AXON entered into at least one agreement with A-STAR whereby it purchased 112 of ARTEC's Broadway 3D devices for $819,273 (below ARTEC's set wholesale prices).  AXON has continued to collaborate with AXON and ID-WISE even after being informed that these companies and other companies associated with the INDIVIDUAL DEFENDANTS are unlawfully selling ARTEC Devices and/or devices built based on misappropriated ARTEC Trade Secrets and/or Confidential Information.  On information and belief, AXON has profited from these transactions, to ARTEC's detriment.

21.     Collectively, A-STAR, ID-WISE, and AXON are referred to as the CORPORATE DEFENDANTS.

22.     In doing the acts herein alleged, unless otherwise stated, each of the defendants, including those fictitiously-named, acted as the alter ego, agent, representative or co-conspirator of each of the others, and in so doing, was acting within the course and scope of such agency, representation or conspiracy. Alternatively, each of the defendants is vicariously liable for the other defendants' misconduct herein alleged by ratification and acceptance of benefits from same.

## II.     SUBJECT MATTER JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000,

1    exclusive of interest and costs, and is between a citizen of the State of California and

2    citizens or subjects of a foreign state who are lawfully admitted for permanent residence in

3    the United States and citizens of and/or domiciled in foreign countries.

4          24.    Venue is proper in the Northern District pursuant to 28 U.S.C. § 1391(b)

5    because a substantial part of the events or omissions giving rise to ARTEC's claim

6    occurred in the district.

7          25.    Intradistrict Assignment:  Pursuant to Civil L.R. 3-2(c) and 3-2(e), the

8    assignment of this action to the San Jose Division is proper because a substantial part of

9    the events or omissions which give rise to the claim occurred in Santa Clara County.

10   Moreover, pursuant to 27 U.S.C. § 1391(b)(3), there is no other United States district court

11   where this case could potentially be brought.

12                    **III.    PERSONAL JURISDICTION**

13         26.    The DEFENDANTS, and each of them, have on multiple occasions availed

14   themselves of the benefits, protections, and privileges of California law to such an extent

15   that it is proper for them to be summoned into California court.

16   **A.    Jurisdiction Over the Individual Defendants.**

17         27.    KLIMOV, KLIMOVA, and STEBLEVA (the "INDIVIDUAL

18   DEFENDANTS") are subject to the jurisdiction of this Court because their employment

19   efforts were centered in California.  For purposes of ARTEC's contract claims, each of the

20   INDIVIDUAL DEFENDANTS' employment included, for example, giving direction of

21   California employees, negotiating contracts on behalf of ARTEC, and interacting with

22   counsel and accountants regarding California tax and legal issues.  Furthermore, their

23   employment and non-disclosure contracts specify application of California law.

24         28.    For purposes of PLAINTIFF's tort claims, each of the INDIVIDUAL

25   DEFENDANTS acted with the intent to perform an actual, physical act in the real world;

26   including misappropriating trade secrets and other intentional torts, as alleged herein.  The

27   INDIVIDUAL DEFENDANTS also allegedly violated the terms of the contracts they

28   entered into with PLAINTIFF.  In addition, the tortious conduct occurred while the three

individual defendants held themselves out as officers and trusted agents of PLAINTIFF.

For example:

- KLIMOV's Employment Agreement listed him as "CEO," he held publicly held himself out as "Chief Financial Officer" in correspondence, and even counsel for DEFENDANTS has referred to KLIMOV in correspondence as "Director and CEO."

- KLIMOV had the power to hire and fire PLAINTIFF's employees, and in fact exercised that power.

- KLIMOV signed financial statements on behalf of Artec California in his capacity as CEO.

- KLIMOV executed a Licensing Agreement between ARTEC and Artec Europe.

- KLIMOV signed an offer letter to Yukhin as "CEO."

- KLIMOVA affirmed her  title as "Chief Financial Officer" in email signature lines.

- KLIMOVA communicated with PLAINTIFF's California IP counsel regarding payment and invoices.

- STEBLEVA affirmed her title of Vice President, Business Development was affirmed in email signature lines and in media interviews.

- STEBLEVA communicated directly with PLAINTIFF's California employees, including those employed at the Palo Alto Showroom, and was authorized to direct their work.

- STEBLEVA twice traveled to California on PLAINTIFF's business and all three defendants took business trip

- S received, and accepted, substantial compensation paid by PLAINTs to the United States to promote PLAINTIFF's business.

- Each of the INDIVIDUAL DEFENDANTIFF and drawn from PLAINTIFF's California bank account.

- Each of the INVIDIVUAL DEFENDANTS obtained a visa for travel to the United States, and did in fact travel in the United States for business related to PLAINTIFF, for which they were reimbursed.

29.     Moreover, each of the INDIVIDUAL DEFENDANTS' tortious conduct violates the terms of agreements that are explicitly governed by California law.  Also, given that each of the INDIVIDUAL DEFENDANTS performed work for PLAINTIFF in some executive capacity, each of the INDIVIDUAL DEFENDANTS would understand the business relationships affected by their breaches of those agreements, and they would know that harm was likely to be suffered in California.

30.     Jurisdiction is also appropriate over each of the INDIVIDUAL DEFENDANTS because their activities caused harm in this district which would not have otherwise arisen absent the employment relationships with plaintiff.

31.     Finally, fair play and substantial justice are served by the exercise of jurisdiction over each of the INDIVIDUAL DEFENDANTS.

**B.     Jurisdiction over the Corporate Defendants.**

32.     The Court has personal jurisdiction over A-STAR, ID-WISE, and AXON because each of them has purposefully directed its activities toward the state of California and this action is based upon activities that arise out of or relate to those contacts. Alternatively, the Court has personal jurisdiction over A-STAR and ID-WISE because each of them is an alter ego of KLIMOV, and vice versa.

### 1.     *Personal Jurisdiction over A-Star*

33.     The Court has personal jurisdiction over A-STAR because, as alleged herein, A-STAR tortiously interfered with the prior and prospective contractual relationships between ARTEC and its distributors, including AXON.

34.     For example, in entering into the unlawful A-Star/Axon contract to sell ARTEC's brand name "Broadway 3D" products or infringing derivatives thereof at below-market rates, A-STAR and its agents and employees, including KLIMOV, knew that they were (a) causing AXON to breach the terms of the August 8, 2012 Non-Exclusive Distribution Agreement between AXON and ARTEC, which was explicitly governed by California law; and (b) usurping the business opportunities of ARTEC, which would have sold its Broadway 3D devices to AXON directly but for A-STAR's unlawful acts.

35.     Furthermore, because the INDIVIDUAL DEFENDANTS were all trusted agents and executives ARTEC, A-STAR would have known that ARTEC is a California corporation with its principal place of business in California, and that A-STAR's sale of cut-rate derivative (or stolen) products to ARTEC's business partners would cause ARTEC harm in California.

36.     In addition, ARTEC is informed and believes that A-STAR's agents stole or orchestrated the theft of saleable inventory of some or all of the 112 Broadway devices involved in its sale to AXON, or the parts and software needed to manufacture and assemble the devices, which prevented those devices and components to be sold by ARTEC, including in California, at a loss to ARTEC in California.

37.     In addition, A-STAR, through the INDIVIDUAL DEFENDANTS, interfered with the contractual relationships between ARTEC and its employees, for example causing them to perform work on behalf of A-STAR, to provide A-STAR with ARTEC's misappropriated trade secrets, and to otherwise aid and abet A-STAR and its agents to unlawfully compete against ARTEC, all while such employees were employed by ARTEC and earning valuable consideration.  A-STAR is therefore liable for (a) the value of the work performed by ARTEC's California employees for which ARTEC received no benefit, (b) for the consideration paid by ARTEC to those employees (by ARTEC's California bank) whose work was secretly benefiting A-STAR, and (c) the lost profits incurred by ARTEC due to delays in completing ARTEC GROUP prototypes and software after A-STAR poached many of its programmers and engineers.

38.     Jurisdiction is further proper because ARTEC's claims against A-STAR arise out of its theft of ARTEC's devices and/or components and misappropriation of software and source code, its interference with ARTEC's agreement with AXON, and its interference with the contracts of ARTEC's employees, *inter alia*.

39.     Finally, fair play and substantial justice are served by the exercise of jurisdiction over A-STAR.

40.    Alternatively, jurisdiction over A-STAR is proper because it is an alter ego of KLIMOV, and vice versa.  Since late 2014, KLIMOV has played a "shell-game" using various corporations, of which A-STAR is just one, to perpetuate his own fraud and private vendetta against ARTEC by unlawfully competing against ARTEC, usurping its business opportunities and interfering with its contracts.  By cloaking himself in the corporate form and by carrying out his unlawful acts through a series of newly established corporate entities, he seeks to escape liability, and an injustice would result if his unlawful actions and contacts with California were not imputed to A-STAR.  In addition:

- On information and belief, KLIMOV entered into negotiations with AXON for the unlawful sale of ARTEC's Broadway 3D devices or infringing derivatives thereof before he incorporated A-STAR.

- On information and belief, KLIMOV has improperly commingled his and his co-conspirators' personal funds and assets with those of A-STAR.

- Based on official sources, KLIMOV is presently the General Director and sole shareholder of A-STAR.

- On information and belief, there is no distinction between the employees and agents of ID-WISE and A-STAR, no separation of resources or technology, and KLIMOV shares his work office with ID-WISE and A-STAR.

- On information and belief, there is no distinction between the employees and agents of ID-WISE and A-STAR, no separation of resources or technology, and KLIMOV shares his work office with ID-WISE and A-STAR.

41.    Alternatively, since this Court has jurisdiction over KLIMOV, it has jurisdiction over A-STAR, which he dominates and controls.  Because A-STAR is merely the instrumentality of KLIMOV, it should be deemed through KLIMOV's contacts to have sufficient contact with California to support personal jurisdiction.

42.    Alternatively, under the totality of the circumstances, this Court has jurisdiction over A-STAR.

1        2.      *Personal Jurisdiction over ID-Wise.*

2        43.     The Court has personal jurisdiction over ID-WISE because of its multiple

3   contacts with

4        44.     ID-WISE's infringing product, the Thor3D Scanner, advertised on proxy

5   website https://spacetime4d.com, listed a U.S. contact number for product purchases: 360-

6   880-5218.[6]

7        45.     The Thor3D website specifically solicits United States and, necessarily,

8   California consumers  by accepting payments via "**wire transfers to EU and US banks**."[7]

9   The "to" is critical, as this demonstrates that Thor3D (and thus ID-Wise) operates at least

10  one bank account in the United States.

11       46.     ID-WISE's employee or agent Anna Zevelyov, a California resident, has

12  contacted ARTEC's United States distributors and attempted to induce them to break their

13  contractual and business relationships with ARTEC and instead sell ID-WISE's Thor3D

14  brand scanner, which is based on ARTEC's misappropriated trade secrets and directly

15  competes with ARTEC's own products.

16            a.      Distributor A:  In August 2015, ARTEC learned that Zevelyov had

17  contacted "Distributor A", an official ARTEC distributor, and sought to induce Distributor

18  A to purchase Thor3D scanners in lieu of ARTEC's scanners in violation of Distributor

19  A's agreements with ARTEC.  Distributor A and related entities are registered California

20  corporate entities licensed to do business in California with agents for service of process in

21  Bakersfield, CA.  On information and belief, Distributor A also has offices in Tustin,

22  California and hold training events in Irvine.

23            b.      Distributor B:  ARTEC has also discovered that Zevelyov contacted

24  "Distributor B," a U.S. distributor with locations in San Jose, Los Angeles, and San Diego.

25

26  _____

27       [6] See https://spacetime4d.com/contact-us/ (last visited Dec. 29, 2015).  As of the
    date of this filing, the website has reverted to being "under construction."

28       [7] See http://thor3dscanner.com/buy/ (last visited Jan. 4, 2016).

1  Through Zevelyov, ID-WISE contacted Distributor B to induce it to breach its agreement

2  with ARTEC and to sell ID-WISE's Thor3D competing scanner.

3          c.      Both Distributor A and Distributor B are existing ARTEC distributors

4  subject to Non-Exclusive Distribution Agreements governed by California law and a

5  forum selection clause consenting "to the exclusive jurisdiction and venue in the state and

6  federal courts in Santa Clara County, California."  DEFENDANTS, and each of them, are

7  and at all times were aware of ARTEC's relationship with Distributor A and Distributor B.

8  Zevelyov personally communicated with one or both distributors while employed by

9  ARTEC and sought to engage them to sell ARTEC devices.

10          d.      On information and belief, Zevelyov and/or other agents or ID-WISE

11  also contacted other ARTEC distributors who conduct business in California and

12  attempted to breach their contractual relationships with ARTEC and sell Thor3D Scanners

13  in lieu of, and/or in addition to ARTEC's competing scanners without advising ARTEC.

14          e.      KLIMOV, Zevelyov, and other agents and employees of ID-WISE,

15  knew that Distributor A, Distributor B, and other U.S. distributors had preexisting

16  relationships with ARTEC, and that ARTEC would be damaged in California if ID-WISE

17  usurped its business opportunities and caused its distributors to breach their contractual

18  obligations to ARTEC.

19      47.    In addition, ID-WISE, through the INDIVIDUAL DEFENDANTS,

20  interfered with the contractual relationships between ARTEC and its employees, for

21  example causing them to perform work on behalf of ID-WISE, to provide ID-WISE with

22  ARTEC's misappropriated trade secrets, and to otherwise aid and abet ID-WISE and its

23  agents to unlawfully compete against ARTEC, all while such employees were employed

24  by ARTEC and earning valuable consideration.  ID-WISE is therefore liable for (a) the

25  value of the work performed by ARTEC's California employees for which ARTEC

26  received no benefit, (b) for the consideration paid by ARTEC to those employees (by

27  ARTEC's California bank) whose work was secretly benefiting ID-WISE, and (c) the lost

28

FIRST AMENDED COMPLAINT FOR DAMAGES
15-cv-03449-HRL

1  profits incurred by ARTEC due to delays in completing ARTEC GROUP prototypes and

2  software after A-STAR poached many of its programmers and engineers.

3        48.     Jurisdiction is further proper because ARTEC's claims against ID-WISE

4  arise out of its misappropriation of software and source code, its unfair competition in

5  developing competitive devices reliant on ARTEC's trade secrets, its interference and

6  attempted interference with ARTEC's distributors doing business in California , and its

7  interference with the contracts of ARTEC's employees, *inter alia*.

8        49.     Finally, fair play and substantial justice are served by the exercise of

9  jurisdiction over ID-WISE.

10       50.     Alternatively, on information and belief, jurisdiction is proper over ID-WISE

11  because it is the alter ego of KLIMOV, as follows:

12
- On information and belief, KLIMOV held himself out as "ID-WISE"
13       even before its incorporation.  For example, as alleged herein, at the
         "Intersec" safety and security exposition held from January 18 to 20,
14       2015, KLIMOV and his co-conspirators (while serving as ARTEC's
         officers, directors, and trusted agents) exhibited under the name "ID-
15       WISE," although ID-WISE was not incorporated until January 22, 2015.[8]

16
- KLIMOV has registered copyrights (based on ARTEC's trade secrets) in
17       Russia under his own name, which on information and belief have been
         used by A-STAR and ID-WISE without any assignment, transfer, or
18       exchange of funds.

19
- On information and belief, KLIMOV has improperly commingled his
20       personal funds and assets, and those of his co-conspirators, with those of
         ID-WISE.
21

22
- On information and belief, although ID-WISE is incorporated in Latvia, it
23       does not have a physical office, employees, or any material assets in
         Latvia.

24
- ARTEC alleges that KLIMOV has played a "shell-game" using various
25       corporations, such as ID-WISE, to perpetuate his own fraud and private

26  _____

27     [8] Additionally, at KLIMOV's direction, two ARTEC employees attended the
    Intersec Expo under the brand name ID-Wise (booth was payed and rented from ID-wise)
28  with devices that competes with Artec Broadways and Intercoms.

FIRST AMENDED COMPLAINT FOR DAMAGES
15-cv-03449-HRL

vendetta against ARTEC by unlawfully competing against ARTEC, usurping its business opportunities and interfering with its contractual relationships.

- Based on official sources, KLIMOV is the General Director and sole shareholder of ID-WISE.

- On information and belief, there is no distinction between the employees and agents of ID-WISE and A-STAR, no separation of resources or technology, and KLIMOV shares his work office with ID-WISE and A-STAR.

51.   Alternatively, since this Court has jurisdiction over KLIMOV, it has jurisdiction over ID-WISE, which he dominates and controls.  Because ID-WISE is merely the instrumentality of KLIMOV, it should be deemed through KLIMOV's contacts to have sufficient contact with California to support personal jurisdiction.

52.   Alternatively, under the totality of the circumstances, this Court has jurisdiction over ID-WISE.

3.   *Minimum Contacts with Axon.*

53.   The Court has jurisdiction over AXON because the Non-Exclusive Distribution Agreement between ARTEC and AXON, which ARTEC alleges was breached when AXON entered into an unlawful contract with A-STAR, constituted a contractual agreement with a California entity.  Moreover, the Axon Agreement contemplated the application of California law:

10.   APPLICABLE LAW

10.1 This Agreement shall be governed by and enforced and interpreted in accordance with the laws of the State of California, USA (without regard to any conflicts of laws principles thereof) including the Uniform Commercial Code as adopted in California, to the exclusion of the UN Convention on Contracts for International Sales of Goods (CISG).

54.   Thus, AXON was aware that any breach of the agreement would damage ARTEC in California, and in fact ARTEC has been so damaged.

55.   In addition, AXON knew that ARTEC alleges that the devices AXON purchased from A-STAR were counterfeit or stolen, as on February 27, 2015 ARTEC's

counsel sent a cease and desist letter to AXON's Managing Director Ijaz Anwer and Head of Department Rafiq Roshan Ali via express mail, e-mail, and facsimile advising them of the same, to which AXON responded.  A second cease and desist letter was sent on May 3, 2015 to Hamdam Mostafa, General Manager of AXON.

56.     Despite its breaches and AGC's cease and desist letters, AXON continues to promote itself as a carrier of AGC products.  The "About Axon" page of their website states that "Our team receives regular trainings at . . . ArtecID[9] . . . and other globally acclaimed partners,"

57.     In addition, AXON's own website confirms its contacts with the United States: "Our products are certified by recognized global certification bodies such as **Underwriter's Laboratories (USA)**."[10]  This would necessarily imply extensive communications with Underwriter's Laboratories in the United States, to include providing samples of products and specifications, to obtain the "UL" badge on its products.

58.     Alternatively, under the totality of the circumstances, this Court has jurisdiction over AXON.

## IV.     SUMMARY OF FACTS.

**A.     Artec Is a Successful Developer and Manufacturer of Proprietary 3D Scanners and 3D Facial Recognition Technology.**

59.     ARTEC is the eponymous[11] company of founder Artyom Yukhin aka Artem Yukhin ("YUKHIN"), a successful entrepreneur whose high tech investments have brought jobs and revenue to the Silicon Valley.

60.     Throughout the relevant time period, YUKHIN has served as ARTEC's President, Chairman of the Board, and Secretary.

---

[9] ArtecID is a trademark of ARTEC GROUP products.

[10]  See http://www.axon.ae/about-axon (last visited Jan. 10, 2016).

[11] The name "Artec" is a compound of "Art" (as in Artyom Yukhin) and "Tech."

61.     Starting in 2008, ARTEC was managed by a group of four individuals who concurrently served as officers and directors, who among them account for 98 percent of the shares of stock of the corporation.  Those four individuals are YUKHIN, Sergey Suhovey ("SUHOVEY"), Gleb Gusev ("GUSEV") and Defendant KLIMOV, as follows:

| Name | Office | No. Shares | % of Total |
|------|--------|-----------|-----------|
| Artyom Yukhin | President, Secretary, CFO | 29,500 | 29.5% |
| Andrey Klimov | Chief Executive Officer | 29,500 | 29.5% |
| Gleb Gusev | Chief Technology Officer | 19,500 | 19.5% |
| Sergey Suhovey | Chief Marketing Officer | 19,500 | 19.5% |
| Totals | | 98,000 | 98.0% [12] |

62.     In addition, KLIMOVA served as the Company's de facto Chief Financial Officer and as legal and financial consultant during relevant time periods.

63.     ARTEC is one of three affiliated corporations of the Artec Group of Companies (the "ARTEC GROUP"), the other two being Artec Europe, S.a.r.l., a Luxembourg company, and OOO Artec Ventures, a Russian company.  The three companies generally share a board of directors and officers and coordinate operations and technology.  ARTEC, Artec Europe, and Artec Ventures are collectively referred to herein as the "ARTEC GROUP" or the "Artec Group of Companies."

64.     The Artec Group of Companies, although separately incorporated, are collectively involved in the research and development, production, manufacturing, sales, and marketing of ARTEC GROUP Devices.  All product lines are shared across the Artec Group of Companies, and employees and service providers of all three Artec Group companies have access to a shared document database.  Engineers employed by all three entities routinely collaborate on product research and development, and on technological improvements for existing products.  Trade secrets, Inventions and Confidential Information, as defined in corporate documents, thus collectively are developed by the Artec Group companies and each company lawfully possesses and uses the Trade secrets,

_____

[12] There are also two minor shareholders who each own one thousand shares of the company, representing 1% of the total outstanding shares.

Inventions and Confidential Information.  Similarly, unfair competition, corporate raiding, piracy, theft, or sabotage impacting one ARTEC GROUP company has a detrimental financial effect on all ARTEC GROUP companies.

65.     ARTEC has obtained multiple patents in the U.S. and internationally related to 3D facial recognition technology, which has the capacity to recognize the facial structure of tens of thousands of unique individuals (much like a fingerprint), and to not be fooled by glasses, caps, or growth of facial hair.

66.     For a number of years ARTEC has been in development of an "intercom" device, by which facial recognition technology could be coupled with access control technology, such that when the device recognized a visitor via facial scan, it caused the door or gate to open, while an unrecognized visitor would be required to proceed to further identification procedures.  The intercom device was predicated largely on the technology underlying ARTEC's other product lines, but also required the development of new source codes, algorithms, and software to permit the seamless interaction between the scanner and a variety of access control devices.  The intercom project was a project of high importance to ARTEC and was anticipated to derive a material portion of ARTEC's revenues.  In addition, ARTEC has been in development of a wireless, handheld version of its popular Eva and Spider brand name scanners.

67.     Many of ARTEC's employees, who subsequently were induced to work for DEFENDANTS to develop competing devices, were involved while employed by ARTEC in programming and engineering the intercom and handheld scanner prototypes.  On information and belief, most or all engineers and programmers who comprised the "rogue group" continue to unlawfully develop competing devices and software on behalf of ID-WISE, A-STAR and other KLIMOV corporations (such as Sense Technology).

**B.     Artec's Employment Agreements with Its Employees and Service Providers.**

68.     As relevant to these claims, ARTEC entered into two key agreements with the INDIVIDUAL EMPLOYEES – an Employment Agreement and a Noncompetition,

Confidentiality, Inventions Agreement ("NCIA").  The agreements were generally entered into on the same date.

1.   *The Employment Agreements.*

69.   Each of the INDIVIDUAL DEFENDANTS was a party to an Employment Agreement with ARTEC.  With the exception of differences in name, date, job title, pay, and the like, the Employment Agreements are identical in all material aspects.

70.   The Employment Agreements are sequentially numbered, such that each employee has an Employment Agreement bearing a unique numerical identifier.  During their employment, each of the INDIVIDUAL DEFENDANTS voluntarily and knowingly entered into an Employee Agreement, as follows:

| Employee Name | Agreement No. | Date |
| --- | --- | --- |
| Andrey Klimov | C/10-07 | May 15, 2010 |
| Yulia Klimova | A/09-28 | March 1, 2009 |
| Anna Stebleva | A/09-27 | March 1, 2009 |

71.   Among the key provisions relevant to this matter are the following:

a.   Duty of loyalty:  Section 2.01 ("General Duties") sets forth an expectation of loyalty and performance of duties within the scope of employment, as follows:

> Subject to the supervision and pursuant to the orders, advice, and direction of the Employer, the Employee shall perform such duties as are customarily performed by one holding such position in other businesses or enterprises of the same or similar nature as that engaged in by the Employer.

b.   Attorney fees provision:  Section 7.01 of each Employment Agreement provided that in an action "to enforce or interpret the terms of this agreement," the prevailing party "shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled."

c.   Applicability of California law:  The Employment Agreements are governed by California law.  For example, Section 9.04 provides that "[t]his Agreement

shall be governed by and construed in accordance with the laws of the State of California." Likewise, Section 6.01 ("At-Will Employment") quotes Labor Code section 2922.

                d.    <u>Agreement not to compete with Artec during employment:</u>  Section 8.01 ("No Conflicting Employment") provided that the KLIMOV, KLIMOVA, and STEBLEVA could not engage in any employment or business activity "directly related" to ARTEC's business during the term of their employment, and would not engage in "any other activities that conflict with his/her obligations to the Company."

                e.    <u>Incorporation of the NCIA:</u>  Section 9.02 ("Containment of Entire Agreement herein") incorporates by reference the Noncompetition, Confidentiality, Inventions Agreement, and states that the Employment Agreement and NCIA "supersede any and all other agreements, either oral or in writing, between the parties . . . ."

                2.    *Artec's Noncompetition, Confidentiality, Inventions Agreements with Its Employees.*

      72.    In addition to the Employment Agreements described *supra*, ARTEC required all of its employees, including the INDIVIDUAL DEFENDANTS, to execute a Noncompetition, Confidentiality, Inventions Agreement ("NCIA") during the term of their employment.  The NCIA's required ARTEC's employees to safeguard and protect the confidentiality of ARTEC's "Inventions" and "Confidential Information," as defined in the NCIA,[13] and prohibited the unauthorized disclosure or use of ARTEC's proprietary information.  For example:

---

    [13] Section 1.1 of each the NCIA stated the following: "'Confidential Information' shall include, without limitation, whether tangible or intangible (i) all information relating to intellectual property, including, without limitation, licenses, patents, trademarks, tradenames, servicemarks and copyrights, (ii) trade secret data and related information, (iii) all information relating to the development, research, testing, manufacturing and marketing activities and techniques of the Company, (iv) all information relating to the products manufactured, sold or distributed by the Company, (v) all information relating to the raw materials, costs, sources of supply and strategic plans of the Company, (vi) all information relating to the identity of special needs of the customers of the Company, (vii) all information relating to the persons and organizations with whom the Company has or has had business relationships, including, without limitation, customer lists, (viii) all information relating to the identity of prospective customers of the Company and (ix) all

a.    <u>Disclosure of Confidential Information prohibited:</u>  Section 2 ("Non-disclosure of Confidential Information") of each NCIA provided that it was "unlawful" for employees to "appropriate, to attempt to appropriate, or to disclose" Confidential Information.  Employees were further required to "hold in confidence all Confidential Information" received and "not to use, disclose, reproduce, or dispose of such Confidential Information in any manner" except in performance of job duties or required by law. Section 2.4 contained an agreement that "all Confidential Information is the product of the Company, regardless if Employee is directly or indirectly involved in the development or creation of such Confidential Information."  Section 2.6 contained an agreement that each employee would "deliver to the Company (and will not keep in his/her possession, recreate or deliver to  anyone else)" any Confidential Information or any devices, correspondences, or documents containing Confidential Information.

b.    <u>Artec owns all inventions unless specified</u>:  Section 4 ("Ownership of Inventions") provided in relevant part that the "**Employee agrees to assist the Company . . . to secure the Company's rights in the Inventions** and any copyrights, patents, [etc.] . . . including the disclosure to the Company of all pertinent information and data with respect thereto."  This obligation explicitly continued "after the termination of this Agreement. . . ."

c.    <u>Use of trade secrets to solicit employees, customers, or vendors prohibited:</u> Section 5 of the Agreement ("No Solicitation") states the following, in relevant part:

> 5.1 Employee agrees that some restrictions on his\her activities during and after his\her employment with the Company are necessary to protect the goodwill, Confidential Information, Inventions and other legitimate business interests of the Company. In recognition thereof, while he\she is employed by the Company and for a period of twelve (12) months thereafter, Employee shall not, without the written consent of the Company, directly or indirectly **attempt to hire any employee of the Company, assist in such hiring by any other person,**

_____

other information which the Company deems confidential and proprietary in its sole discretion."

1
2

**encourage any such employee to terminate his\her relationship with the Company, or solicit or encourage any customer or vendor of the Company to terminate its relationship with the Company** . . . .

3      d.    Obligation to return all Confidential Information upon termination:

4 Section 6 of the Agreement ("Surrender of Confidential Information and Inventions")

5 required employees to "surrender to the Company upon termination" all "written or

6 otherwise tangible documentation, in whatever form, representing or embodying

7 Confidential Information or Inventions or copies thereof . . . ."

8      e.    Indemnification and attorney fees:  Significantly, Section 8

9 ("Survival; Relief") of each NCIA provided for the recovery of attorney fees and costs, in

10 addition to injunctive relief and other damages, in the event of breach:

11
12
13
14
15
16
17

8.1 . . . Employee acknowledges that a violation of the provisions of this Agreement by Employee may result in **irreparable harm to the Company**. Therefore, Employee agrees that the Company  shall be entitled to **preliminary and permanent injunctive relief** against any breach by Employee of the provisions of this Agreement, without having to post bond; provided, that nothing in the foregoing clause shall limit the **Company's right to seek monetary damages, including, without limitation, attorney's fees, costs and disbursements**, as it may have sustained in the event of the violation by Employee of any of the provisions of this Agreement.

18      f.    California law applies:  By their terms, the NCIAs were to "be

19 governed and construed in accordance with the laws of the State of California without

20 regard to the conflict of laws principles thereof."  (Section 10.3.)  Also, Exhibit B to each

21 agreement, entitled "California Labor Code Section 2870 / Employment Agreements;

22 Assignment Of Rights," quoted directly from Labor Code § 2870 and bound the parties

23 thereto.

24      73.    On information and belief, each of the INDIVIDUAL DEFENDANTS

25 entered into an NCIA at the time that he or she executed his or her Employment

26 Agreement.  Each of the INDIVIDUAL DEFENDANTS was bound by the NCIA at all

27 relevant times, and continue to be bound.

28

74.     Furthermore, on information and belief, A-STAR and ID-WISE were actually aware of the provisions of the Employment Agreements and the NCIAs.

**C.      Artec's Distributorship Agreement with Axon Business Systems.**

75.     ARTEC's business model is structured on a network of distributor relationships in various countries in which the company seeks to sell its products.

76.     On August 8, 2012, ARTEC entered into a "Non-Exclusive Distribution Agreement" with Axon Business Systems LLC ("AXON"), a United Arab Emirates company.  The Axon Agreement granted AXON the right to sell ARTEC's facial recognition devices and 3D scanners, including in connection with its trademarked "Broadway 3D" lines, to purchasers in the UAE.  In exchange, AXON agreed to protect ARTEC's Trade Secrets and Confidential Information obtained during the course of the parties' relationship.

77.     The term of the Axon Agreement was for one year (subject to renewal on agreement of the parties), the parties also agreed that certain provisions would survive the termination of the Axon Agreement, particularly in respect to Confidential Information, as defined in Section 1.1 of the Agreement (which definition includes "trade secrets").[14]

78.     Section 2.9 prohibited AXON even after the term of the Agreement from "distribut[ing] equipment or products similar to or competitive with the Products in the Territory without ARTEC's prior written consent" and further required that AXON "keep

_____

[14] Under Section 1.1 of the Axon Agreement, "Confidential Information" is defined as "intellectual property, trade secrets, and other proprietary information relating to ARTEC's business strategies. plans, financial data. projections, customer information, markets. and Products (as hereinafter defined), but shall not include any such information which (i) as of the date of disclosure to Distributor was already lawfully in Distributor's possession and not subject to a non-disclosure or confidentiality arrangement; (ii) Distributor independently develops, as shown by written records; (iii) is or becomes publicly available without a breach of this Agreement; or (iv) Distributor rightfully receives from a third party who is lawfully in possession of such information and under no obligation to maintain its confidentiality."

1    ARTEC informed of Distributor's current or future sales of equipment or products similar

2    to or competitive with" ARTEC's products.[15]

3        79.    Similarly, Section 2.11 required AXON as a continuing obligation to "notify

4    ARTEC promptly of any and all **infringements**, limitations, simulations, **unlawful uses**,

5    or misuses of the ARTEC Marks, patents, and other intellectual property rights."[16]

6        80.    Section 2.12 stated, "Distributor shall maintain in confidence and not

7    disclose to any third party any Confidential Information" and that "Distributor shall not

8    use the Confidential Information to the detriment of ARTEC under any circumstances."

9    The Parties contemplated that "Distributor's obligations with respect to the disclosure and

10   use of Confidential Information shall survive the termination or expiration of this

11   Agreement."

12       81.    Section 7.5 of the Agreement stated, "Upon termination of this Agreement,

13   Distributor shall immediately cease all use of the ARTEC marks."  Thus, AXON was

14   prohibited from selling or marketing any of ARTEC's marks, including Broadway 3D.

15       82.    Section 10.1 of the Axon Agreement ("Applicable Law") provided that "This

16   Agreement shall be governed by and enforced and interpreted in accordance with the laws

17   of the **State of California, USA** (without regard to any conflicts of laws principles

18   thereof) including he Uniform Commercial Code as adopted in California."

19       83.    Each of the above–referenced provisions were continuing obligations which

20   **survived** the non-renewal of the Axon Agreement.

21   **D.    Overview of Defendants' Unlawful Actions.**

22       84.    ARTEC enjoyed the benefits of its various agreements with its employees

23   and its regional distributors, and also performed all of its duties under these agreements,

24   _____

25       [15] Under Section 7.2, "The restrictions on the use and dissemination of Confidential
     Information stated in Sections 1.1 and **2.9 shall survive the termination of this**
26   **Agreement**."  Section 1.1 contained the definition of "Confidential Information."

27       [16] Under Section 8.2, "The representations, warranties and covenants set forth in
     Sections 2.10, 2.11, and 3.5 and the indemnification obligations in Section 6.6 **shall**
28   **survive the termination of this Agreement**."

and at all times used reasonable steps to safeguard its Confidential Information and Trade Secrets. Prior to February 12, 2015, ARTEC had no reason to suspect or believe that any of its employees, including the INDIVIDUAL DEFENDANTS, or any of its distributors, including AXON, had taken any action in breach of their duties or contractual agreements, or in violation of any law.

85.     On February 12, 2015, documents were discovered at co-conspirator Olga Chernetskaya's office in Moscow (OOO Artec Ventures office) that linked KLIMOV, along with the other INDIVIDUAL DEFENDANTS, to a wide-ranging conspiracy involving members of ARTEC's top management and engineers, as well as rank and file employees.  Subsequent investigation revealed that KLIMOV, along with KLIMOVA and STEBLEVA, had led a group of rogue employees, including programmers, engineers, and administrators, to breach their contracts with ARTEC in order to compete directly against ARTEC in the field of 3D facial recognition scanners, solicit ARTEC's customers, and usurp ARTEC's business opportunities.

86.     Based on the investigation conducted, and subsequent information obtained from the hard drives of the INDIVIDUAL DEFENDANTS' work computers, on ARTEC's servers, and in the INDIVIDUAL DEFENDANTS' company emails, ARTEC is informed and believes that KLIMOV orchestrated this covert conspiracy sometime in mid-2014 while serving as its CEO and Director.  During this time, KLIMOV induced or coerced other current ARTEC employees to breach their contracts with the Company and provide him access to Trade Secrets and other Confidential Information via ARTEC's secure interface, and forward him key source code of ARTEC's proprietary software.  In addition, ARTEC uncovered a series of emails between Peter Parkhalin (Senior Programmer) and KLIMOV in which Parkhalin provided KLIMOV with access to Artec Group proprietary source code and algorithms, and forwarded him proprietary documents.

87.     The conspiracy was further manifested through written correspondence obtained by ARTEC: In Skype chats and emails with KLIMOV, his co-conspirators openly

referred to going "**underground**," circulated their "**conspiracy e-mail address**," and referred to opening an "**independent company**" and being **"independent from Artem**."

88.    In November 2014, KLIMOV in collaboration with a group of rogue ARTEC employees, founded A-STAR, a Russian corporation, and KLIMOV began doing business under that name.  On information and belief, the INDIVIDUAL DEFENDANTS falsely represented to Artec Group's business partners that A-STAR was a legitimate Artec Group entity or affiliate.  In that way, they induced Artec Group distributors and customers to do business with A-STAR instead of the Artec Group.

89.    Through A-STAR, the INDIVIDUAL DEFENDANTS sold and manufactured competing 3D devices based on ARTEC's Trade Secrets and Confidential Information to undermine its invaluable vendor and distributor relationships.

90.    For example, on January 7, 2015, while continuing to serve as CEO and Director, KLIMOV executed a Product Supply Agreement on behalf of A-STAR with AXON, a longtime ARTEC distributor in the United Arab Emirates.  The Product Supply Agreement called for the sale of 112 of ARTEC's "Broadway 3D" facial recognition devices and scanners for $819,273, which prices were below ARTEC's set wholesale prices.  Those revenues were never reported to or shared with ARTEC.   The agreement not only violated KLIMOV's duty of loyalty and contractual obligations, but it also violated AXON's prior agreement with ARTEC.

91.    ARTEC also discovered that on January 22, 2015, while still employed as ARTEC CEO, KLIMOV incorporated the company ID-WISE to compete against ARTEC in the realm of facial recognition technology, and to exploit ARTEC's Trade Secrets and Confidential Information.

92.    Immediately following the discovery of the conspiracy on February 12, 2015, KLIMOV's employment, directorship, and position as CEO were terminated through action of a majority of shareholders and directors, due to the discovery of the unlawful and injurious actions that form the basis of this complaint.

93.     KLIMOVA was also relieved of all duties as CFO and as Legal and Financial Consultant and STEBLEVA her duties as Vice President of Business Development.  The INDIVIDUAL DEFENDANTS' access to ARTEC's servers, databases, and email has since been revoked.[17]

94.     However, the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE (as well as related entities) have continued to do business in a manner injurious to ARTEC. They are now openly competing against ARTEC, using misappropriated Artec Group Trade Secrets and Confidential Information that they purloined while ostensibly carrying on as loyal employees.  ARTEC has uncovered evidence of cash transfers from A-STAR to certain of ARTEC's suppliers in exchange for products that are in every material respect identical to ARTEC's own products.

**E.     Klimov Conspires with Managerial and Lower Level Employees to Sabotage and Compete Directly Against Artec.**

1.     *The Correspondences Written Among Individual Defendants Reveal an Intent to Conspire Against Artec and Concrete Steps to Attain that Goal While Employed by Artec.*

95.     Correspondences and chat sessions uncovered by ARTEC from company email and hard drives reveal the development of the conspiracy to compete against ARTEC by many of the INDIVIDUAL DEFENDANTS, during the term of their employment with ARTEC.  The following reflects a small portion of those communications:

96.     Emails and Skype chats reveal that STEBLEVA actively recruited Artec's employees to join the current "rogue employees," while she was employed at Artec.  As an inducement, she offered them double their current salary.

_____

[17] Nevertheless, from time to time, the INDIVIDUAL DEFENDANTS have been sent emails to their ARTEC email addresses, which further demonstrate their continued breaches of contract and their duties to ARTEC.

97.     In Skype conversations dating from August and September 2014, KLIMOV discussed the creation of an external source code repository for software modifications, and new scanner hardware and software development.[18]  An external repository would directly conflict with ARTEC's security protocols and safeguards of its Confidential Information and Trade Secrets.

98.     In a Skype chat dated September 20, 2014 between KLIMOV and STEBLEVA stated, "**in order to make money, it is necessary to open an independent company in Europe**," and added, "**independent from Artem** [Yukhin]."  KLIMOV responded, "**Opening a company is not a problem**."  The two then brainstormed about what markets to tap, mentioning Germany, Finland, the Czech Republic

99.     In the same conversation, STEBLEVA also proposed getting "Sasha [Alexander Lomakin, an Artec Europe service provider], Anya [Anna Zevelyov], I, you, Yulia [Yulia Klimova], Kolya [ARTEC Senior Programmer Nikolay Kulikov] and everyone together to talk."

100.    On November 7, 2014, STEBLEVA engaged in a lengthy Skype chat with KLIMOV regarding the employees that, on information and belief, would be needed to open a competing business.  For example, the two discussed "how any people will only work on security," how much tech support," and needing programmers, hardware, logistics, accounting, and a lawyer.

101.    On November 14, 2014, STEBLEVA sent a Skype message to KLIMOV in which she stated that she had attempted to register the domain name "3dflow.com" but that it was registered to another company.  ARTEC had not authorized any registration of 3dflow.com and had no knowledge of this.

---

[18] The existence of an external repository for source code (as opposed to the internal access-controlled Redmine system) would be antithetical to ARTEC's collaborative and secured source code development processes.  Also, KLIMOV had not discussed the creation of a new line of scanners or software with any of the other ARTEC officers and directors.

102.   In a subsequent email chain involving KLIMOV and co-conspirators Igor Poklad and Nail Salmanov, there are discussions of creating a new scanner, although not an ARTEC scanner.

103.   In a Skype conversation between STEBLEVA and co-conspirator Olga Zinchenko (marketing manager) from January and early February 2015, the two discuss at length ID-WISE devices.  Zinchenko claimed that she told one potential client to check out ID-WISE's intercom device instead of Artec's intercom.  STEBLEVA also told Zinchenko to delete all emails that she sent to her, including one email that she accidentally sent to the ARTEC address.

104.   In a Skype chat during the period of November 14, 2014 and December 4, 2014 between KLIMOV, Poklad, and Salmanov, Salmanov wrote the following:  "Hello everyone.  **We've gone underground.  In regards to the scanner, etc. etc., e-mails must bypass official e-mail.  Igor [Poklad], let me know the address of your conspiracy e-mail**."

105.   In Skype chats from December 2014 to early February 2015, STEBLEVA and Zinchenko discussed the new "id-wise" brand, securing a new website, the branding of a product line including "ID-Wise Gate" and "ID-Wise 3D Enterprise," and creating email addresses @id-wise.com.

106.   Also, a draft email dated January 20, 2015 was found on STEBLEVA's hard drive, in which she appeared to be creating a budget for the conspirators' new separate business related to security devices.  That email goes so far as to list the individuals who purportedly would be involved in the competing company, comprised of other then-ARTEC and ARTEC GROUP employees.  The email calculated the estimated gross salaries of these prospective employees of the infringing company, as well as referencing "Latvia," where ID-WISE was incorporated.

1
2

2.   *Klimov Engaged in Documented Attempts to Obtain, Copy, and Misappropriate Artec's Confidential Information.*

3   107.   On information and belief, one of KLIMOV's first overt acts in furtherance

4   of the conspiracy to compete against the Artec Group was to obtain Artec Group source

5   code and algorithms that were the building blocks for its proprietary 3D facial recognition

6   scanners.  The source code and algorithms were the result of years of investment by the

7   Artec Group and all constituted Trade Secrets and/or Confidential Information.

8   108.   The Artec Group spent significant sums over a period of years in developing

9   and protecting Artec Trade Secrets and Confidential Information, which were not available

10   to the general public.  ARTEC had also spent considerable efforts to keep this information

11   secure.  Indeed, it was not even available to most ARTEC or Artec Group employees.

12   Even KLIMOV did not have access.  The only way to access these trade

13   secrets/confidential information was through a project management tool called "Redmine"

14   (see http://en.wikipedia.org/wiki/Redmine) and the GIT distributed revision control system

15   (https://en.wikipedia.org/wiki/Git_(software), which required users to enter a special

16   username and password.  Employees with access were prohibited from granting access to

17   other employees without corporate approval.

18   109.   In or about October 2014, KLIMOV demanded that ARTEC's system

19   administrator issue to KLIMOV a username and password to Redmine in October 2014,

20   which was in fact issued to KLIMOV on or around that time.  As a Senior Engineer,

21   Parkhalin enjoyed special access to the source code, proprietary algorithms and software

22   for the Artec Group's products.  With Parkhalin's assistance and at KLIMOV's direction,

23   KLIMOV received a username and password to Redmine in October 2014.

24   110.   On October 6, 2014, in breach of his contractual and legal obligations,

25   Parkhalin sent an email to KLIMOV at his work address entitled "Redmine." The email

26   provided copies of core algorithms, and source code, to KLIMOV.  Parkhalin was not

27   authorized to process such algorithms and source code to KLIMOV.

28

111.   On October 8, 2014, after KLIMOV was granted access Redmine, KLIMOV's newly acquired username and password were used to enter Redmine and, on information and belief, <u>download 18 separate Artec Studio algorithms</u>.  In addition, on October 12, 2015, at KLIMOV's direction, Parkhalin downloaded core algorithms from Redmine and transferred them to KLIMOV without ARTEC's authorization, approval, or knowledge.

112.   On October 13, 2014, Parkhalin emailed KLIMOV at his work address entitled "algorithms' description."  The email attached four files containing ARTEC algorithms and code.  Parkhalin's email stated as follows (translated from Russian):

> Hello!
>
> I am sending you descriptions of several basic algorithms.
>
> **The code might raise many questions**, because in fact it is much lengthier and I selected only parts of it.  I took the descriptions from various sources and added some of my own.

113.   On October 15, 2014, Parkhalin sent a third email to KLIMOV, this time attaching a file named "spider.docx" that he explained was a "Spider code," which were code segments pertaining to ARTEC's Spider scanner.  On information and belief, DEFENDANTS in fact used the Spider code shortly thereafter to create their competing Thor3D Scanner.

114.   Through these and other unauthorized actions, Parkhalin provided KLIMOV and other DEFENDANTS with the ability to reproduce, rely upon, and misappropriate Artec Group Trade Secrets and Confidential Information for the purpose of unlawfully competing against ARTEC.

115.   ARTEC has further uncovered a "cracked" version of Artec Studio, the Artec Group's proprietary software, on Parkhalin's network share.  This "cracked" version permitted KLIMOV and others to utilize and modify Artec Group source code, algorithms, and software to replicate or alter saleable devices based on Artec Group Trade Secrets and Confidential Information.

3. *Klimov Secretly Copyrighted Artec's Source Code and Software Under His Own Name During His Tenure as CEO.*

116. KLIMOV further breached his agreements and duties with ARTEC by registering copyrights and trade names relying on or identical to Artec Group devices and technology, while still employed and serving as ARTEC CEO.

117. On or about December 15, 2014, KLIMOV applied for four copyrights in Russia in his individual capacity:  One was entitled "Computer program for calculating the 3D coordinates when projecting points or lines," a second "Computer program for simplification of polygonal surfaces". Applications for these copyrights were filed on or about October 31, 2014.  The copyrights were subsequently registered between January 16 and February 25, 2015.

118. Each of these applications and registrations relied on copied proprietary source code and algorithms belonging to Artec Group.  These applications and registrations were filed and obtained without the knowledge or authorization of ARTEC or any other Artec Group entity.

119. On information and belief, KLIMOV and other DEFENDANTS have sought to use the source code and algorithms upon which these copyright applications were based to develop and manufacture Infringing Devices that compete with ARTEC and the Artec Group.  KLIMOV has unfairly profited and been enriched through such sales, to the detriment of ARTEC and the Artec Group.

120. In addition, on December 22, 2014 KLIMOV incorporated a Russian limited liability company known as "Artek 3D."  This was done without Artec Group authorization or knowledge, and represents an attempt to trade under the Artec name, or a close approximation thereof, in furtherance of his acts of unfair competition. KLIMOV has changed the name of the company in or around March 2015 after its existence was discovered by ARTEC.

4.     *The Trade Secrets Misappropriated by Klimov Include Prototypes and Source Code for Building an Intercom Device.*

121.   During KLIMOV's final years at ARTEC, he knew that ARTEC was secretly developing an intercom device that it planned to introduce to the market.

122.   Former ARTEC Senior Programmer Nikolay Kulikov was one of the lead engineers in the intercom project.  Kulikov was also involved in testing the product on the doors of Artec Group offices.  The INDIVIDUAL DEFENDANTS succeeded in inducing Kulikov to provide them with access to and/or forward them confidential construction documents, schemes, and drawings, and source code using his access.

123.   ARTEC has also retained contemporaneous records of discussions between Stebleva and other ARTEC employees regarding the intercom project.

1.     ARTEC is informed and believes that the "Advanced Real-Time 3D Face Access Control" device featured on the ID-WISE website (http://www.enter-face.com, which is the forwarded web address of http://www.id-wise.com), which is accessible to the general public, is predicated in whole or in material part on ARTEC's protected trade secrets and Confidential Information.

5.     *Through His New Company A-Star LLC, Klimov Entered into an Unlawful Distributor Relationship with Axon Business Systems LLC While Employed by Artec.*

124.   On December 22, 2014, during his tenure as ARTEC's CEO, Director, and employee, KLIMOV founded "A-Star LLC," a company headquartered in Moscow. KLIMOV is listed as A-STAR's Chief Executive Officer and General Director.

125.   On January 7, 2015, two weeks after A-STAR's incorporation, A-STAR and longtime ARTEC distribution partner AXON entered into "Product Supply Agreement #H-01/2014," which was executed by KLIMOV (in the capacity of "General Manager").  The agreement called for the sale of 112 ARTEC Devices to AXON for distribution in the United Arab Emirates.  The contract was for the purchase by AXON of Broadway 3D

1  models BT, BM, and BMC." These devices all belonged to the Artec Group and were

2  trademarks used in connection with Artec Group's 3D facial recognition devices.

3      126.   The agreement was for a grand total of $819,273, which in aggregate was a

4  far lower price than Artec Group's usual price for authentic ARTEC devices.  The

5  agreement called for the delivery of the "first lot" to take place on February 28, 2015 (34

6  total items), the "second lot" on April 20, 2015 (45 total items), and the third lot on May

7  20, 2015 (33 total items).  It was agreed that AXON would pay $249,061 for the first lot,

8  $328,360 for the second lot, and $241,852 for the third lot.  Each payment was to be made

9  to A-STAR via wire transfer to an account that was unrelated to any Artec Group entity.

10      127.   On information and belief, AXON has made payment for the first batch of

11  the stolen products Funds in the amount of $245,741.90 on or about February 28, 2015.

12  The funds were deposited in a Moscow bank account linked to A-STAR.

13      128.   On information and belief, these products and/or the parts needed to

14  manufacture them were deliberately stolen by A-STAR and the INDIVIDUAL

15  DEFENDANTS, or some of them, from Artec Group warehouses and then shipped to

16  AXON.

17      129.   On information and belief, subsequent shipments of stolen or infringing

18  products have been made to AXON by one or more companies operated by KLIMOV

19  and/or other INDIVIDUAL DEFENDANTS, and AXON has made additional payments

20  for such items.

21      130.   Further, the Supply Agreement specified a web site located at

22  www.5dstar.com.  The site contained an advertising for a new 3D Scanner. This web site

23  was not associated with Artec Group of Companies and demonstrates that A-STAR and its

24  shareholders who were at that time ARTEC's employees, officers, and directors, were

25  already working on developing a competing 3D Scanner.

26

27

28

6.      *Defendants Converted Artec Physical Property, Misappropriated and/or Infringed Artec Confidential Information, and Misrepresented Inventory and Financial Information in Order to Fill the Axon Orders.*

131.    On information and belief, in order to make good on their commitment to deliver 112 Broadway devices, the INDIVIDUAL DEFENDANTS and A-STAR converted ARTEC's Trade Secrets and Confidential Information, as well as physical hardware, misappropriated and/or infringed on ARTEC's Confidential Information, and engaged in deceptive practices to source and manufacture additional devices, at ARTEC's expense and without ARTEC's knowledge.  As described below, the INDIVIDUAL DEFENDANTS and A-STAR, or some of them, covered up this theft through a complex scheme, including the following:

a.      As directed and authorized by KLIMOV, starting in August 2014, STEBLEVA and others obtained stolen parts with which to manufacture duplicate products by submitting fake warranty maintenance and repair claims for equipment previously supplied to legitimate Artec Group customers.  This was within STEBLEVA's role as manager of the sales of Broadway 3D devices.  STEBLEVA subsequently refused to provide Artec Group warranty maintenance and repair activity reports requested as part of an audit.

b.      As directed and authorized by KLIMOV, ARTEC employee Andrey Streltsov, ostensibly in his capacity as technical support engineer whereby his responsibilities included management of the warranty repairs for the ARTEC GROUP, submitted false reports inflating the number of warranty repairs to camouflage the fact that many of the product "replacements" were actually for the purpose of manufacturing Infringing Devices relying on Confidential Information and Trade Secrets.  Streltsov caused Artec Group manufactures to fill these orders, misrepresenting that the Artec Group was ordering these repairs.

c.      As directed and authorized by KLIMOV, Poklad oversaw the assembly of Artec Group Devices and engaged ARTEC and other Artec Group employees

1  using Artec Group equipment.  On information and belief, ARTEC and Artec Group

2  employees were not aware that the assembly was not officially sanctioned by the Artec

3  Group and that the purpose of their assembly was for sale to AXON for the personal

4  enrichment of KLIMOV and other INDIVIDUAL DEFENDANTS, as well as A-STAR,

5  and to the detriment of ARTEC and Artec Group.

6          d.      Also as directed and authorized by KLIMOV, Poklad falsely "wrote

7  off" allegedly poor quality materials and parts as defective when those materials and parts

8  were in fact being used for the manufacture of infringing products.

9          e.      As directed and authorized by KLIMOV, STEBLEVA conducted the

10 negotiations with AXON ostensibly in her capacity as an ARTEC or Artec Group

11 employee and knowingly withheld from ARTEC and Artec Group that she was actually

12 conducting negotiations on behalf of A-STAR, for A-STAR's enrichment as well as the

13 personal enrichment of the INDIVIDUAL DEFENDANTS.

14         f.      ARTEC Manager Irina Drozdova (as directed by KLIMOV and

15 STEBLEVA) covertly issued invitations ostensibly on behalf of the Artec Group with the

16 forged signature of Artyom Yukhin to members of AXON's management team, as well as

17 the management of system integrator Red Solutions LLC to travel to Russia and meet with

18 KLIMOV and STEBLEVA in person and, on information and belief, other INDIVIDUAL

19 DEFENDANTS. Such invitations were required to receive a visa to travel to Russia.

20         g.      As directed and authorized by KLIMOV, Chernetskaya processed the

21 stolen and/or Infringing Devices' export documentation ostensibly in her official capacity

22 as an Artec Group employee, but knowingly and intentionally did so for the financial gain

23 of A-STAR, for which she was (and is believed to still be) a founder and shareholder.  For

24 example, Chernetskaya prepared customs documentation for the export of the goods.  The

25 transaction report related to this export represents that the goods to be supplied are Artec

26 Group products, specifically Broadway 3D products.

27         h.      On February 9, 2015, KLIMOV entered into a service agreement with

28 a company called "Alta-Soft" in his capacity of "General Director" of A-STAR.  On

information and belief, Alta-Soft's purpose is to provide customs clearance for the export of the stolen or Infringing Devices.  The subject of the specific agreement is to enable communication and data transfer for electronic customs declaration.  Chernetskaya is the point of contact specified in the agreement, and the contact email is "ekaterina.poplevina@gmail.com," which is the private email address of Ekaterina Poplevina, another ex-ARTEC employee who ARTEC alleges was involved in the conspiracy.

      i.     KLIMOV, KLIMOVA, STEBLEVA, and Chernetskaya thereafter engaged in false and misleading financial accounting designed to obfuscate the fact that Artec Group resources were being diverted to A-STAR for the financial gain of A-STAR and the INDIVIDUAL DEFENDANTS and to the detriment of ARTEC and Artec Group.

      j.     On information and belief, when A-STAR delivered the Broadway 3D-branded ARTEC Devices to AXON in the United Arab Emirates, per KLIMOV's instructions, some of ARTEC's employees replaced ARTEC's logo and references to ARTEC with references to A-STAR and/or ID-WISE.  Similarly, KLIMOV and others misappropriated ARTEC's instruction and construction manuals for the Broadway devices and Artec's new 3D face recognition intercom system and replaced references to ARTEC with DEFENDANTS' own companies.

      k.     On information and belief, KLIMOV directed other INDIVIDUAL DEFENDANTS to remove or deactivate the access control requirements of ARTEC's Broadway 3D-branded devices sold to AXON.

      7.     *Klimov Continued to Unlawfully Compete Against Axon Through a Second Newly Formed Company, ID-Wise.*

132.   On January 22, 2015, a company named "ID-Wise, SIA" ("ID-WISE") was incorporated in the Republic of Latvia.  As of February 2, 2015, KLIMOV was identified as the company's sole shareholder and thereafter as its sole Board Member.

133.    However, even before January 22, KLIMOV and others of the INDIVIDUAL DEFENDANTS were already using the name "ID-Wise" for purposes of competing against ARTEC.

134.    For example, from January 18 to 20, 2015, a safety and security exposition known as the Intersec Expo ("Intersec") took place in Dubai, United Arab Emirates. Intersec advertises itself as a "must-attend trade fair for safety, security, fire protection and homeland security."

135.    Unbeknownst to ARTEC, "Id-Wise" was listed as an exhibitor at Intersec (see http://www.intersecexpo.com/frankfurt/exhibitor/630/3500/id-wise.aspx (last visited July 23, 2015).  Chernetskaya was listed as the "Stand Manager."  On information and belief, other rogue ARTEC employees were induced by DEFENDANTS to represent "Id-Wise" at Intersec, including under the brand "ID-Face."

136.    On information and belief, KLIMOV was physically present at Intersec in January 2015.  For example, ARTEC is in possession of log-in information from KLIMOV dating from January 18, 2015, during Intersec, with origination addresses from the United Arab Emirates.

137.    Thereafter, and continuing to the present, KLIMOV and other INDIVIDUAL DEFENDANTS have sought to compete against ARTEC through ID-WISE's devices, including the Thor3D and EnterFace 3D Scanners, which ARTEC is informed and believes are based on misappropriated trade secrets.

138.    ID-WISE has also targeted the market for an intercom device of the type that was being developed by ARTEC.  As stated, the "Advanced Real-Time 3D Face Access Control" device featured on the ID-WISE-operated website http://www.enter-face.com is predicated in whole or in material part on ARTEC's protected Trade Secrets and Confidential Information.

8. *Axon Has Continued to Breach Its Continuing Obligations with Artec Through Its Relationships with A-Star and ID-Wise.*

139. Through its distribution agreement with ARTEC, AXON agreed *inter alia* to maintain ARTEC's Confidential Information, to advise ARTEC of any relationships with competing companies, and only to use or sell ARTEC's marks during the period of their Agreement. These provisions survived the term of the Agreement itself.

140. By entering into a separate agreement with A-STAR for the purchase of 112 Broadway devices, which AXON knew was an ARTEC brand, AXON materially breached its continuing obligations to ARTEC. On information and belief, AXON was unjustly enriched by purchasing the devices from A-STAR at artificially low prices, thus ensuring a higher profit.

141. On May 3, 2015, the Artec Group, through counsel, informed AXON of this breach and sought information related to its dealings with A-STAR, ID-WISE, KCCC Ltd. (another illicit entity) and other entities related to KLIMOV, STEBLEVA, and other former ARTEC employees. AXON refused to cooperate and continued to breach its continuing obligations.

142. For example, until approximately June 13, 2015, AXON had continued to link to ARTEC's Broadway 3D facial recognition system even though it had no active agreement with ARTEC to advertise or sell Broadway 3D. On information and belief, the Broadway 3D systems advertised on AXON's website had either been purloined by DEFENDANTS from ARTEC's warehouses or were covertly built by DEFENDANTS using misappropriated ARTEC parts and technology.

143. In addition, AXON has continued to communicate with employees of ID-WISE, as set forth above, specifically with regard to 3D technology after being warned in writing on several occasions by ARTEC that such employees have been infringing on Artec Group's technology.

**COUNT ONE**

**Violation of Uniform Trade Secrets Act (Cal. Civil Code §§ 3426, et seq.)**

**(Against All INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE)**

144.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 143 as though fully set forth herein.

145.   ARTEC's technology, source code, algorithms, software, cost information, pricing structures and profit margins, pending patent applications, vendor, and manufacture, distributor, and customer lists and contact information, *inter alia,* are Trade Secrets as defined by the California Uniform Trade Secrets Act, Civil Code § 3426 et seq. ("the UTSA").   A detailed description of the Trade Secrets will be set forth under appropriate obligations of confidentiality pursuant to Civil Code 3426.5.

146.   ARTEC's Trade Secrets derive actual or potential independent economic value because they are not generally known within the industry or the public at large, provide valuable competitive business advantage to ARTEC and are the result of significant research and development, know-how and monetary investment made by ARTEC and the ARTEC GROUP.

147.   ARTEC has taken proper and reasonable efforts under the circumstances to insure that the Trade Secrets in its possession remain known only to ARTEC, the ARTEC GROUP, and to any other authorized person under written confidentiality agreements, which include the NCIA's between ARTEC and the INDIVIDUAL DEFENDANTS.

148.   In addition, ARTEC has taken precautions to restrict access to its proprietary source code and algorithms to a handful of individuals with privileged access to its Redmine security interface.  For example, even KLIMOV did not have access to Redmine and only obtained such access by inducing with Parkhalin, a Senior Engineer, to obtain a username and password on his behalf and to forward him ARTEC GROUP algorithms.

149.   ARTEC is informed and believes, and on that basis alleges that DEFENDANTS, and each of them, have acquired ARTEC's Trade Secrets by improper means, including, without limitation, by theft and by breach of duty to maintain secrecy,

1  including by directing or inducing ARTEC employees to perform the thefts and breaches

2  on their behalf. Such acts constitute misappropriation under the UTSA.

3       150.   ARTEC is informed and believes that DEFENDANTS, and each of them,

4  have misappropriated ARTEC's Trade Secrets and are presently using ARTEC's Trade

5  Secrets in connection with DEFENDANTS' own business activities and not on behalf of

6  ARTEC and without ARTEC's express or implied consent, authorization or authority.

7  Such acts constitute misappropriation under the UTSA.

8       151.   ARTEC is informed and believes, and on that basis alleges that

9  DEFENDANTS, and each of them, have misappropriated, used, and have disclosed

10  ARTEC's Trade Secrets and/or Confidential Information to the other DEFENDANTS and

11  to third parties.

12       152.   The conduct of DEFENDANTS, and each of them, has caused, and will

13  continue to cause, irreparable harm to ARTEC. Unless and until enjoined, each of the

14  DEFENDANTS will continue to receive the benefit of the Trade Secrets and/or

15  Confidential Information misappropriated from ARTEC, which trade secrets have aided

16  and will continue to aid DEFENDANTS, and each of them, to compete unfairly against

17  ARTEC. Moreover DEFENDANTS will continue to expand their business, solicit

18  potential customers of ARTEC and disclose ARTEC's Trade Secrets to third parties.

19       153.   ARTEC is informed and believes and on that basis alleges that

20  DEFENDANTS have wrongfully acquired gains resulting from their conduct, and have

21  accepted such gains with the knowledge that the gains came from such wrongful conduct.

22  Thus, DEFENDANTS, and each of them, hold the wrongfully acquired gains in

23  constructive trust for the benefit of ARTEC, and ARTEC is entitled to an accounting of

24  those gains.

25       154.   As a result of such misappropriation, ARTEC is entitled to actual damages.

26       155.   As a further proximate result of the misappropriation of ARTEC's Trade

27  Secrets by Defendants, and each of them, ARTEC has been damaged in that

28  DEFENDANTS, and each of them, have and will continue to receive the benefits of the

Trade Secrets, which have aided and continue to aid DEFENDANTS, and each of them, to compete unfairly against ARTEC, and ARTEC will suffer the loss of revenues from sales of its products and associated services.  ARTEC's competitive position, based upon its valuable knowledge, access to and use of its Trade Secrets, will be irretrievably lost. ARTEC is therefore entitled to injunctive relief to prevent DEFENDANTS from continuing to unfairly compete against ARTEC.

156.    Further, DEFENDANTS, and each of them, will be unjustly enriched in an amount that is separate and distinct from ARTEC's damages.

157.    ARTEC is informed and believes and on that basis alleges that in misappropriating ARTEC's Trade Secrets, and engaging in the wrongful misconduct alleged herein, DEFENDANTS acted willfully and are guilty of oppression, fraud and malice. ARTEC is therefore entitled to exemplary or punitive damages and attorneys' fees.

**COUNT TWO**

**Breach of Written Employment Contract**

**(Against All INDIVIDUAL DEFENDANTS)**

158.    ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 157 as though fully set forth herein.

159.    As set forth herein, ARTEC entered into a Employment Agreements with each of the INDIVIDUAL DEFENDANTS, each of which bore its own unique sequential number.  Each Agreement was to remain in effect "until terminated by either the Employer or the Employee."  (Section 1.01.)

160.    Section 2.01 ("General Duties") sets forth an expectation of loyalty and performance of duties within the scope of employment, such that the INDIVIDUAL DEFENDANTS, and each of them, were required to "perform such duties as are customarily performed by one holding such position in other businesses or enterprises of the same or similar nature as that engaged in by the Employer."

161.    The Employment Agreements also prohibited the INDIVIDUAL DEFENDANTS, and each of them, from competing against ARTEC during their period of

44

1  employment.  In relevant part, Section 8.01 ("No Conflicting Employment") stated the

2  following:

> Employee agree[s] that, during the term of his/her employment with the Company, he/she will not engage in any other employment, occupation, consulting or other business activity **directly related to the business in which the Company is now involved or becomes involved during the term of his/her employment**, nor will he/she engage in any other activities that **conflict with his/her obligations to the Company**.

8      162.   ARTEC has at all times performed the terms of the contract in the manner

9  specified by the contract.

10      163.   In violation of their Employment Agreements, the INDIVIDUAL

11  DEFENDANTS, and each of them, engaged in other employment, occupation, consulting

12  or other business activity directly related to ARTEC's business during their employment,

13  including misappropriating the Trade Secrets and Confidential Information in ARTEC's

14  possession, effecting or facilitating the development, manufacture, marketing, and sale of

15  devices in ARTEC's lawful possession containing the proprietary 3D facial recognition

16  technology of ARTEC GROUP, and engaging other activities conflicting with such

17  employee's obligations to ARTEC.

18      164.   Through such conduct, the INDIVIDUAL DEFENDANTS, and each of

19  them, breached their obligations to the company by engaging in business "directly related

20  to" the business of ARTEC, and which otherwise conflicted with their obligations to

21  ARTEC.

22      165.   Moreover, such conduct did not constitute "duties as are customarily

23  performed by one holding such position in other businesses or enterprises of the same or

24  similar nature as that engaged in by the Employer."

25      166.   ARTEC has been, and continues to be, irreparably harmed by the breaches

26  described herein.

27      167.   ARTEC's damage was, and is, proximately caused by the breaches described

28  herein.

168.   As a result of INDIVIDUAL DEFENDANTS' breaches, ARTEC is entitled to compensatory damages pursuant to Civil Code § 3300 in an amount sufficient to compensate ARTEC for all detriment proximately caused by the breaches of the INDIVIDUAL DEFENDANTS.  ARTEC is further entitled to lost profits, including future lost profits, caused by the breaches of the INDIVIDUAL DEFENDANTS.  *Sanchez-Corea v. Bank of America,* 38 Cal.3d 892, 907-08 (1985); *Fisher v. Hampton,* 44 Cal.App.3d 741, 747 (1975).

169.   In the alternative, ARTEC is entitled to restitution in an amount to compensate ARTEC for the amount by which the INDIVIDUAL DEFENDANTS, and all of them, have been unjustly enriched through their actions.  *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726 (2000).

170.   ARTEC is also entitled to mandatory prevailing party attorney's fees and costs as provided for in Section 7.01 of the Employment Agreement, which provides that "[i]f any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled."

**COUNT THREE**

**Breach of Noncompetition, Confidentiality, Inventions Agreement**

**(Against the INDIVIDUAL DEFENDANTS)**

171.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 169 as though fully set forth herein.

172.   As set forth herein, the INDIVIDUAL DEFENDANTS, and each of them, were signatories to a Noncompetition, Confidentiality, Inventions Agreement ("NCIA") during their period of employment.  Each NCIA was entered into prior to the activities upon which this Complaint is based.

173.   During their employment, and continuing after their separation from ARTEC and into the present, the INDIVIDUAL DEFENDANTS materially breached their

obligations to ARTEC as set forth in the NCIA with reference to Confidential Information and Inventions, as defined therein (see footnote 14 *supra*), including as follows:

a.    In violation of Section 2.1 of the NCIA, the INDIVIDUAL DEFENDANTS, and on information and belief each of them, appropriated, attempted to appropriate, and/or disclosed ARTEC's Confidential Information to third parties.

b.    In violation of Section 2.2 of the NCIA, the INDIVIDUAL DEFENDANTS, and on information and belief each of them, failed to hold in confidence all Confidential Information received, acquired, produced or developed by them in the course of their employment with ARTEC, both during and after their employment with ARTEC terminated.

c.    Also in violation of Section 2.2 of the NCIA, the INDIVIDUAL DEFENDANTS, and on information and belief each of them, used, disclosed, reproduced or disposed of Confidential Information in a manner not required by law or done in connection with the performance of his or her duties and responsibilities to ARTEC, both during and after his or her employment with ARTEC terminated.

d.    In violation of Section 2.6 of the NCIA, the INDIVIDUAL DEFENDANTS, and on information and belief each of them, at the time of leaving the employ of ARTEC, failed to deliver to ARTEC devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings  blueprints, sketches, materials, equipment, other documents and/or property, and/or reproductions of the same belonging to ARTEC or its successors or assigns, including Artec Europe and Artec Ventures. Furthermore, on information and belief, the INDIVIDUAL DEFENDANTS, and each of them, kept such items in their possession, recreated, and/or delivered them to third parties without the consent or authorization of ARTEC.

e.    In violation of Section 4.1 of the NCIA, the INDIVIDUAL DEFENDANTS, and on information and belief each of them, performed work related to Inventions but failed to maintain accurate records related to such Inventions, to disclose relevant records to ARTEC, or to keep ARTEC informed of Inventions made or conceived

FIRST AMENDED COMPLAINT FOR DAMAGES
15-cv-03449-HRL

1  by them, as the result of any work for or at the request of ARTEC, or which related to

2  activities, products, services or processes of ARTEC.

3          f.     In violation of Section 4.4 of the NCIA, the INDIVIDUAL

4  DEFENDANTS, and on information and belief each of them, failed to secure ARTEC's

5  rights in the Inventions or other intellectual property rights relating thereto, and further

6  failed to disclose to ARTEC all pertinent information and data with respect thereto.

7          g.     In violation of Section 5.1 of the NCIA, the INDIVIDUAL

8  DEFENDANTS, and on information and belief each of them, while employed by ARTEC

9  and/or within twelve months after their employment ended, directly or indirectly attempted

10 to hire employees of ARTEC, assisted others in the hiring of such employees, encouraged

11 employees to terminate their relationship with ARTEC, and/or solicited or encouraged

12 customers and/or vendors of ARTEC to terminate its relationship with ARTEC.

13         h.     In violation of Section 6.1 of the NCIA,  the INDIVIDUAL

14 DEFENDANTS, and on information and belief each of them, failed to surrender to

15 ARTEC upon termination of their employment, all written or otherwise tangible

16 documentation, in whatever form, representing or embodying Confidential Information or

17 Inventions or copies thereof, whether or not prepared by such employee or another, in that

18 employee's possession or control.

19         i.     In further violation of the terms of the NCIA, on information and

20 belief, each INDIVIDUAL DEFENDANT who had entered into an NCIA misappropriated

21 and/or disclosed Trade Secrets and Confidential Information to third parties, including the

22 other DEFENDANTS herein.

23     174.   ARTEC has been, and continues to be, irreparably harmed by the breaches

24 described herein.

25     175.   ARTEC's damage was, and is, proximately caused by the breaches described

26 herein.

27     176.   As a result of the breaches herein alleged, ARTEC is entitled to

28 compensatory damages pursuant to Civil Code § 3300 in an amount sufficient to

1  compensate ARTEC for all detriment proximately caused by the breaches of the

2  INDIVIDUAL DEFENDANTS.  ARTEC is further entitled to lost profits, including future

3  lost profits, caused by the breaches of the INDIVIDUAL DEFENDANTS.[19]

4  177.  In the alternative, ARTEC is entitled to restitution in an amount to

5  compensate ARTEC for the amount by which the INDIVIDUAL DEFENDANTS have

6  been unjustly enriched through their actions. *Lectrodryer v. SeoulBank* (2000) 77

7  Cal.App.4th 723, 726.

8  178.  Moreover, ARTEC is entitled to attorney's fees and costs as provided for in

9  Section 8.01 of the NCIA.

10  **COUNT FOUR**

11  **Breach of Written Distributor Agreement**

12  **(Against AXON)**

13  179.  ARTEC re-alleges and incorporates by reference the allegations in

14  paragraphs 1 through 178 above as if fully set forth herein.

15  180.  On August 8, 2012, ARTEC entered into a "Non-Exclusive Distribution

16  Agreement" with AXON.  The Axon Agreement granted AXON the right to sell ARTEC's

17  facial recognition devices and 3D scanners, including its "Broadway 3D" lines, to

18  purchasers in the UAE.  In exchange, AXON agreed to protect ARTEC's intellectual

19  property and confidential information obtained during the course of the parties'

20  relationship.

21  181.  Although the term of the Axon Agreement was for one year (subject to

22  renewal on agreement of the parties), the parties also agreed that certain provisions would

23  survive the termination of the Axon Agreement, particularly in respect to trade secrets and

24  confidential information, including Section 2.9, 2.11, 2.12, and 7.5:

25  • Section 2.9 provided in relevant part that "Distributor shall keep

26  ARTEC informed of Distributor's current or future sales of equipment

27

28  [19] *Sanchez-Corea v. Bank of America,* 38 Cal.3d 892, 907-08 (1985); *Fisher v. Hampton,* 44 Cal. App. 3d 741, 747 (1975).

or products similar to or competitive with the Products" and that "[i]n the event that Distributor begins sales of equipment or products similar or competitive with the Products, Distributor shall inform ARTEC of that fact not later than one month after the commencement of such sales."[20]

- Section 2.11 provided in relevant part that "Distributor shall maintain in confidence and not disclose to any third party any Confidential Information.  Distributor shall make no use of Confidential Information except to further the business interests of the parties as contemplated by this Agreement. Distributor shall not use the Confidential Information to the detriment of ARTEC under any circumstances."[21]

- Section 2.12 provided in relevant part that "Distributor shall maintain in confidence and not disclose to any third party any Confidential Information.  Distributor shall make no use of Confidential Information except to further the business interests of the parties as contemplated by this Agreement. Distributor shall not use the Confidential Information to the detriment of ARTEC under any circumstances. . . .  Distributor's obligations with respect to the disclosure and use of Confidential Information shall survive the termination or expiration of this Agreement."

- Section 7.5 provided in relevant part that "Upon termination of this Agreement, Distributor shall immediately cease all use of the ARTEC Marks."

182.    By entering into the Product Service Agreement with A-STAR on January 7, 2015, for the unauthorized sale of 112 ARTEC's Broadway 3D devices, or infringing counterfeits or reproductions thereof, for $819,273, and by continuing to transact for 3D scanners, facial recognition devices and/or intercom devices with A-STAR and, on information and belief, ID-WISE, AXON has materially breached its continuing obligations to ARTEC as set forth in the Axon Agreement, including as follows:

- In violation of its continuing obligations under Section 2.9, AXON distributed equipment or products similar to or competitive with the

---

[20] Pursuant to Section 7.2, the obligations in Section 2.9 "shall survive the termination of this Agreement."

[21] Pursuant to Section 8.2, "The representations, warranties and covenants set forth in Section[] . . . 2.11 . . . shall survive the termination of this Agreement."

FIRST AMENDED COMPLAINT FOR DAMAGES
15-cv-03449-HRL

ARTEC products in the United Arab Emirates without ARTEC's prior written consent. Also in violation of Section 2.9, AXON failed to keep ARTEC informed of AXON's current or future sales of equipment or products similar to or competitive with ARTEC's products.

- In violation of its continuing obligations under Section 2.11, AXON failed to notify ARTEC promptly of any and all infringements, limitations, simulations, unlawful uses, or misuses of ARTEC marks, patents, and other intellectual property rights.

- In violation of its continuing obligations under Section 2.12, AXON failed to maintain in confidence, and instead disclosed, Confidential Information as defined in Section 1.1 to some or all of the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE. In further violation of Section 2.12, AXON used the Confidential Information to the detriment of ARTEC.

- In violation of its continuing obligations under Section 7.5, following termination of the Axon Agreement, AXON failed to cease all use of the ARTEC marks.

183.    AXON has continued to breach the terms of the Axon Agreement and to conspire with other DEFENDANTS to unlawfully compete against ARTEC even after being timely served with cease and desist letters. AXON has further failed or refused to assist ARTEC in its investigation into wrongdoing by other DEFENDANTS with whom AXON conspired, to ARTEC's detriment.

184.    ARTEC has been, and continues to be, irreparably harmed by the breaches described herein.

185.    ARTEC's damage was, and is, proximately caused by the breaches described herein.

186.    As a result of the breaches herein alleged, ARTEC is entitled to compensatory damages pursuant to Civil Code § 3300 in an amount sufficient to compensate ARTEC for all detriment proximately caused by the breaches of the AXON. ARTEC is further entitled to lost profits, including future lost profits, caused by the breaches of AXON.

187.    In the alternative, ARTEC is entitled to restitution in an amount to compensate ARTEC for the amount by which AXON has been unjustly enriched through its actions.

**COUNT FIVE**

**Unjust Enrichment**

**(Against All DEFENDANTS)**

188.    ARTEC re-alleges and incorporates by reference the allegations in paragraphs 1 through 187 above as if fully set forth herein.

189.    ARTEC is informed and believes and on that basis alleges that as a proximate and legal result of DEFENDANTS' wrongful and/or unlawful conduct as alleged in this Complaint, Defendants have been unjustly enriched, including without limitation by unjustly reaping and retaining the benefits from unauthorized use of ARTEC's Trade Secrets and Confidential Information.  For example, DEFENDANTS, and each of them, wrongfully obtained a detailed knowledge of protected source code, algorithms, software, and programs upon which ARTEC GROUP products are based and which were in ARTEC's lawful possession at the time of their misappropriation; a detailed knowledge of vendors and customers of ARTEC and affiliated companies, and individuals working at those vendors and customers; detailed financial analyses of ARTEC's business model and pricing structures; knowledge of production facilities where ARTEC's products are manufactured; knowledge of the strengths and limitations of the ARTEC's products; knowledge of ARTEC's advertising and marketing relationships, contracts, and spending; and other information and know-how that could not have been obtained by DEFENDANTS but for their association with ARTEC.

190.    DEFENDANTS have obtained access to this information at little or no cost and have thereby been unjustly enriched to ARTEC's detriment.

191.    ARTEC is entitled to recover from DEFENDANTS, and each of them, the gains, profits, advantages and unjust enrichment that they have obtained as a result of their wrongful and/or unlawful acts.

192.    As a result of the foregoing unjust enrichment, DEFENDANTS have a duty to ARTEC to account for and make restitution to ARTEC of all monies, property, assets, and all of the benefits received or to be received, directly or indirectly, by such defendants as a result of the retention, use, investment and reinvestment thereof.

**COUNT SIX**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Against INDIVIDUAL DEFENDANTS)**

193.    ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 192 as though fully set forth herein.

194.    The Employment Agreements and NCIAs entered into between ARTEC, on the one hand, and each the INDIVIDUAL DEFENDANTS, on the other hand, were valid contracts supported by valuable consideration. ARTEC fully performed its obligations thereunder or has been excused therefrom.

195.    Implied in ARTEC's contracts with the INDIVIDUAL DEFENDANTS, and each of them, was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefit of the agreement.

196.    The INDIVIDUAL DEFENDANTS, and each of them, failed to perform their obligations under the Employment Agreement and/or the NCIA in good faith by knowingly, intentionally, and in bad faith concealing from ARTEC the existence of projects on which they were working while in ARTEC's employ through which they intended to and did directly compete against ARTEC, and/or assisted other DEFENDANTS in directly competing against ARTEC, based on misappropriated or stolen Trade Secrets, Confidential Information, and proprietary hardware or components thereof.

197.    As a direct and proximate result of the INDIVIDUAL DEFENDANTS', and each of their, knowing, intentional, and in bad faith breach of the parties' implied covenant of good faith and fair dealing, ARTEC has sustained and will continue to sustain damages. The precise nature and amount of such accrued and continuing damages is not known by ARTEC and cannot be ascertained by it at the present time, but such damages are, on

1  information and belief, substantial and in excess of the jurisdictional minimum of this

2  Court.

3  **COUNT SEVEN**

4  **Breach of the Implied Covenant of Good Faith and Fair Dealing**

5  **(Against AXON)**

6  198.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through

7  197 as though fully set forth herein.

8  199.   The Non-Exclusive Distribution Agreement entered into between ARTEC,

9  on the one hand, AXON, on the other hand (the "Axon Agreement"), was a valid contract

10  supported by valuable consideration. ARTEC fully performed its obligations thereunder or

11  has been excused therefrom.

12  200.   Implied in ARTEC's contracts with the AXON was a covenant that the

13  parties would deal with each other in good faith and would not engage in any conduct to

14  deprive the other of the benefit of the agreement.

15  201.   AXON failed to perform its obligations under the Axon Agreement in good

16  faith by knowingly, intentionally, and in bad faith engaging in the conduct set forth herein.

17  202.   As a direct and proximate result of AXON's knowing, intentional, and in bad

18  faith breach of the parties' implied covenant of good faith and fair dealing, ARTEC has

19  sustained and will continue to sustain damages. The precise nature and amount of such

20  accrued and continuing damages is not known by ARTEC and cannot be ascertained by it

21  at the present time, but such damages are, on information and belief, substantial and in

22  excess of the jurisdictional minimum of this Court.

23  **COUNT EIGHT**

24  **Tortious Interference with Contract**

25  **(Against All INDVIDUAL DEFENDANTS, A-STAR, and ID-WISE)**

26  203.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through

27  202 as though fully set forth herein.

28

FIRST AMENDED COMPLAINT FOR DAMAGES

15-cv-03449-HRL

204.   ARTEC is informed and believes, and on that basis alleges, that KLIMOV, KLIMOVA, STEBLEVA, A-STAR, and ID-WISE, and each of them, acting with full knowledge of the contractual obligations of each of ARTEC's employees, offered inducement to various other ARTEC employees, and otherwise engaged in wrongful conduct calculated to interfere with ARTEC's contracts with its employees.

205.   On information and belief, those employees include other INDIVIDUAL DEFENDANTS, as well as other ARTEC employees who have subsequently been induced to work on behalf of A-STAR, ID-WISE or related enterprises.

206.   Through such inducements and wrongful conduct, the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE, and each of them, knowingly and willfully induced ARTEC's employees to breach their contract with ARTEC or otherwise intentionally interfered with ARTEC's contracts with its employees.

207.   ARTEC is informed and believes, and on that basis alleges, that, but for the wrongful conduct of the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE, and each of them, most if not all of its "rogue" employees would not have breached their contracts with ARTEC.

208.   By their wrongful conduct, the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE, and each of them, intended to and have caused other ARTEC employees to breach and repudiate their contracts with ARTEC and have attempted to gain an unfair competitive advantage against ARTEC by, among other things, obtaining Confidential Information from its employees, designing, manufacturing and selling devices that rely on the Confidential Information and Trade Secrets of ARTEC and affiliated entities, and conspiring with them to form and staff competing companies.

209.   Through such actions, the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE, and each of them, have taken the profits resulting from these unauthorized projects and ventures for their own benefit and to ARTEC's financial detriment.

210.    As a proximate result of the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE's intentional interference with contract, ARTEC has been damaged in an amount to be determined at trial.

211.    In doing the acts herein alleged, the INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE acted with oppression, fraud, malice, and in conscious disregard of the rights of ARTEC, and ARTEC is therefore entitled to punitive damages according to proof at the time of trial.

## COUNT NINE

### Conversion

### (Against All DEFENDANTS)

212.    ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 211 as though fully set forth herein.

213.    ARTEC is informed and believes, and on that basis alleges, that DEFENDANTS, and each of them, have improperly taken and converted ARTEC's Confidential Information to their use.  The precise nature and value of the Confidential Information converted by defendants is not known by ARTEC and cannot be ascertained by it at the present time, but is, on information and belief, substantial and in excess of the jurisdictional minimum of this Court.

214.    ARTEC is informed and believes, and on that basis alleges, that in committing the acts alleged herein, DEFENDANTS, and each of them, are guilty of oppression, fraud or malice in that defendants wrongfully and unlawfully obtained ARTEC's Confidential Information in order to benefit themselves at ARTEC's expense. ARTEC is therefore entitled to the payment of damages in a sum sufficient to punish defendants, to set an example and to deter such conduct in the future.

## COUNT TEN

### Fraudulent Concealment

### (Against KLIMOV)

215.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 214 as though fully set forth herein.

216.   During their employment with ARTEC, KLIMOV was engaged in a confidential, contractual, and agency relationship with ARTEC by virtue of his position as the company's CEO and a member of the Board of Directors.

217.   Such agency relationship imposed a fiduciary duty to disclose to ARTEC any unlawful actions or other misconduct that were in dereliction of KLIMOV's work responsibilities to ARTEC or otherwise damaged and/or compromised ARTEC's business. This duty was part of KLIMOV's duty of undivided loyalty to and fiduciary relationship with ARTEC arising from the nature of his relationship with ARTEC and ARTEC repose of trust and confidence in him.

218.   KLIMOV intended to induce ARTEC's reliance on his conduct as being lawful and proper, and ARTEC reasonably relied on KLIMOV's conduct, believing his efforts to be loyal and true.

219.   As alleged hereinabove, KLIMOV knowingly misappropriated ARTEC's Trade Secrets and Confidential Information, converted ARTEC's products and parts, created new companies that competed against ARTEC and entered into relationships with ARTEC's prior distributor, caused his new companies to appear as exhibitors of 3D technology during at least one international conference, and solicited ARTEC's employees to aid and abet him in these actions and subsequently to work for his companies.

220.   ARTEC had no knowledge that KLIMOV had engaged in any of these actions.

221.   At no point in time did KLIMOV advise ARTEC or any of its loyal officers or employees about the conduct alleged herein.

222.   Until February 12, 2015, ARTEC had no knowledge that KLIMOV had engaged in any of the conduct alleged herein.  Upon discovery of such conduct, ARTEC immediately acted to remove KLIMOV in all of his official capacities and sever the employment relationship.

223.   Had ARTEC known of the true facts related to KLIMOV's attempts to compete against ARTEC, misappropriate its property, and poach its employees, it never would have permitted such actions. KLIMOV therefore engaged in a fraudulent concealment in failing to inform ARTEC of this conduct.

224.   KLIMOV's concealment was in dereliction of his fiduciary duty to ARTEC requiring him to refrain from acting against the interests of ARTEC.

225.   These failures to disclose by KLIMOV to ARTEC were material because ARTEC, had it had knowledge, would not have allowed AXON to act as its nominal distributor, nor KLIMOV to divert sales away from ARTEC or poach its employees, nor KLIMOV to incorporate competing entities while ostensibly acting as a CEO and Director of ARTEC, nor to represent his new companies and not ARTEC in the field of 3D technology at international conferences.

226.   KLIMOV made these concealments with knowledge of the material omissions and with intent to deceive ARTEC into relying on the material omissions. Among other things, KLIMOV never advised ARTEC of the creation or existence of the Product Supply Agreement with AXON. Further, Skype chats, Google Hangout sessions, and email correspondences between KLIMOV and various of the INDIVIDUAL DEFENDANTS demonstrate that KLIMOV intended to engage in this conduct without ARTEC's knowledge and to induce ARTEC to believe that he was at all times acting in the best interest of the company.

227.   ARTEC reasonably relied on KLIMOV's material omission of the wrongful actions alleged herein, to its detriment.  As a result, ARTEC had potential sales diverted from it, had its devices and parts misappropriated from warehouses or manufactured under false pretenses at additional costs, lost the value of KLIMOV's and the other INDIVIDUAL DEFENDANTS' services and salary, and has had its goodwill and reputation damaged.

228.   KLIMOV's fraudulent concealment entitles ARTEC to recovery of all damages suffered as a result of the fraud, including disgorgement of KLIMOV's ill-gotten

1  gains, ARTEC's lost sales and profits, recovery of the salaries paid to employees who

2  KLIMOV caused to secretly aid and abet his acts of competition, the value of any devices

3  or parts misappropriated by KLIMOV, the value of any Trade Secrets or Confidential

4  Information taken by KLIMOV or at his direction, and the value of the goodwill and loss

5  of reputation incurred as a result of his actions.

6          229.    KLIMOV's concealment was tortious, malicious, outrageous, oppressive,

7  fraudulent, made in bad faith, and in conscious disregard of ARTEC's rights. Accordingly,

8  in addition to general and compensatory damages, ARTEC should be awarded exemplary

9  and punitive damages sufficient to punish and make an example of KLIMOV.

10                             **COUNT ELEVEN**

11                         **Breach of Fiduciary Duty**

12                   **(Against All INDIVIDUAL DEFENDANTS)**

13         230.    ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through

14  229 as though fully set forth herein.

15         231.    As the Chief Executive Officer and Director of ARTEC, KLIMOV owed

16  ARTEC fiduciary duties of honesty and undivided loyalty. As an officer and director of

17  ARTEC, KLIMOV also owed heightened duties of non-disclosure and candor. KLIMOV

18  was well aware that he was in a position that required great trust, required that he always

19  act in the best interests of ARTEC, and that his position with ARTEC made him

20  accountable to ARTEC as a fiduciary.

21         232.    As the de facto Chief Financial Officer of ARTEC, KLIMOVA owed

22  ARTEC fiduciary duties of honesty and undivided loyalty. As an officer and executive of

23  ARTEC, KLIMOVA also owed heightened duties of non-disclosure and candor.

24  KLIMOVA was well aware that she was in a position that required great trust, required

25  that she always act in the best interests of ARTEC, and that her position with ARTEC

26  made her accountable to ARTEC as a fiduciary.

27         233.    As the Vice President of Business Development of ARTEC, STEBLEVA

28  owed ARTEC fiduciary duties of honesty and undivided loyalty. As an executive of

1  ARTEC, STEBLEVA also owed heightened duties of non-disclosure and candor.

2  STEBLEVA was well aware that she was in a position that required great trust, required

3  that she always act in the best interests of ARTEC, and that her position with ARTEC

4  made her accountable to ARTEC as a fiduciary.

5      234.   The INDIVIDUAL DEFENDANTS, and each of them, by virtue of their

6  positions, knew the contents of ARTEC's agreements with its employees, and the

7  importance of the policies set forth therein.

8      235.   The INDIVIDUAL DEFENDANTS, and each of them, breached their

9  fiduciary duties to ARTEC through the actions described herein, including but not limited

10  to the following:

11          a.   Secretly competing against ARTEC while they themselves were

12  ARTEC's fiduciaries;

13          b.   Conspiring with other ARTEC employees to compete against

14  ARTEC;

15          c.   Inducing ARTEC's employees to breach their contractual

16  relationships with ARTEC and their duties of loyalty;

17          d.   Wilfully and intentionally inducing or causing such employees to

18  materially breach their agreements with ARTEC in violation of their known duties to

19  ARTEC;

20          e.   Misappropriating and covertly selling ARTEC GROUP Devices,

21  Confidential Information and Trade Secrets that were in the lawful possession of ARTEC;

22  and

23          f.   Manufacturing and selling products based on source code, algorithms,

24  and other Trade Secrets and Confidential Information belonging to the ARTEC GROUP.

25      236.   The INDIVIDUAL DEFENDANTS, and each of them, further breached

26  their duty of candor to ARTEC by not disclosing to ARTEC their acts of unfair

27  competition and interference with contract, *inter alia*.

28

237.    The INDIVIDUAL DEFENDANTS, and each of them, further breached their fiduciary duties to ARTEC by failing to disclose to ARTEC their and other employees' activities in misappropriating Confidential Information to their own personal electronic storage devices for the purpose of competing against ARTEC and the ARTEC GROUP.

238.    On information and belief, the INDIVIDUAL DEFENDANTS, and each of them, continued their employment with ARTEC and to hold themselves out as ARTEC's fiduciaries and trusted agents for at least six months after their initial actions taken against the interests of the Company, without disclosing their activities that were not authorized by ARTEC.

239.    The INDIVIDUAL DEFENDANTS, and each of them, committed the acts alleged herein maliciously, fraudulently and oppressively, with a wrongful intention of injury against ARTEC with improper motives amounting to malice and a conscious disregard of ARTEC's rights.

240.    By direct and proximate virtue of the INDIVIDUAL DEFENDANTS', and each of their, breach of their fiduciary duties owed to ARTEC, ARTEC has suffered monetary damages and irreparable injury in an amount according to proof at trial.

241.    As a direct and proximate result of the INDIVIDUAL DEFENDANTS', and each of their, breaches, ARTEC is further entitled to an injunction restraining and enjoining the INDIVIDUAL DEFENDANTS, and each of them, and those in active concert with them and acting on their behalf from (i) using, disclosing or converting in any manner or in any form any of ARTEC's Confidential Information; and (ii) hiding or destroying any documents or other evidence in any way concerning the allegations in this Complaint.

242.    ARTEC is further entitled to an injunction compelling the INDIVIDUAL DEFENDANTS, and each of them, and those in active concert with them and acting on their behalf to (i) submit to forensic analysis any and all computer systems and electronic storage devices, including personal computers, personal email accounts, Skype accounts,

1  Google Hangout sessions, handheld devices and/or USB or other drives, to determine the

2  extent to which KLIMOV and KLIMOVA possess or have possessed any of ARTEC's

3  Confidential Information in any form; (ii) return to ARTEC any property or information

4  belonging to ARTEC; and (iii) destroy any and all copies of such information in their

5  possession.

6         243.   ARTEC is further entitled to disgorgement of the INDIVIDUAL

7  DEFENDANTS, and each of their, salary and any additional compensation during the

8  period in which they were in breach of their fiduciary duties, which on information and

9  belief started in August 2014 at the latest; invalidation of the transfer or sale of KLIMOV's

10 shares of ARTEC stock to a third party; disgorgement of KLIMOV's shares of ARTEC

11 stock; compensatory damages in an amount to be decided at trial; and punitive damages.

12                              **COUNT TWELVE**

13            **Breach of Duty of Loyalty (Labor Code §§ 2860, 2863)**

14                   **(Against All INDIVIDUAL DEFENDANTS)**

15        244.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through

16 243 as though fully set forth herein.

17        245.   At all relevant times during their employment, the INDIVIDUAL

18 DEFENDANTS, and each of them, owed ARTEC a duty of loyalty, including acting for

19 ARTEC's benefit, protecting ARTEC's interests, preserving its relationships with

20 distributors and customers, and subordinating his personal interests to those of ARTEC.

21        246.   Labor Code section 2860 provides that everything an employee acquires by

22 virtue of his or her employment belongs to the employer, whether acquired during or after

23 the expiration of the term of his or her employment.

24        247.   Labor Code section 2863 provides that an employee who has any business to

25 transact on his own account that is similar to that entrusted to the employee by his

26 employer must give preference to the business of the employer.

27

28

248.   By virtue of the acts and omissions of the INDIVIDUAL DEFENDANTS as alleged herein above, the INDIVIDUAL DEFENDANTS have each breached the duties of loyalty owed to ARTEC.

249.   As a direct and proximate result of the unlawful acts of the INDIVIDUAL DEFENDANTS, ARTEC has sustained and will continue to sustain damages. The precise nature and amount of such accrued and continuing damages is not known by ARTEC and cannot be ascertained by it at the present time, but such damages are, on information and belief, substantial and in excess of the jurisdictional minimum of this Court.

250.   ARTEC is informed and believes, and on that basis alleges, that in committing the acts alleged herein, the INDIVIDUAL DEFENDANTS are guilty of oppression, fraud and malice entitling ARTEC to punitive or exemplary damages in an amount appropriate to punish the INDIVIDUAL DEFENDANTS and to make an example of them to the community.

## COUNT THIRTEEN

### Civil Conspiracy

### (Against All DEFENDANTS)

251.   ARTEC re-alleges and repeats the facts contained in Paragraphs 1 through 250 as though fully set forth herein.

252.   A civil conspiracy exists where there is a formation and operation of a conspiracy and the plaintiff suffers damage from an act or acts done in furtherance of the conspiracy's common design.

253.   On information and belief, DEFENDANTS, and each of them, have formed and operated a conspiracy for the purpose of misappropriating Trade Secrets and Confidential Information of ARTEC and affiliated companies; and using such Trade Secrets and Confidential Information to tortiously interfere with the contractual relationships existing between ARTEC and various distributors and end customers.

254.   ARTEC alleges herein that the actions of DEFENDANTS, and each of them, individually and in concert were wrongful and done with intent to harm ARTEC.

255.   All of the actions of DEFENDANTS, and each of them, individually and in concert with all other Defendants were in furtherance of the conspiracy.

256.   As a direct and proximate result, ARTEC has suffered injury and damage to its business all to its damage in an amount according to proof at trial.

257.   ARTEC is informed and believes, and on that basis alleges, that in committing the acts alleged herein, DEFENDANTS, and each of them, are guilty of oppression, fraud and malice entitling ARTEC to punitive or exemplary damages in an amount appropriate to punish defendants and to make an example of them to the community.

## COUNT FOURTEEN

### Constructive Trust

### (Against All DEFENDANTS)

258.   ARTEC re-alleges and incorporates by reference the allegations in paragraphs 1 through 257 above as if fully set forth herein.

259.   At all times relevant to this Complaint, a confidential relationship existed between ARTEC and each of the INDIVIDUAL DEFENDANTS by virtue of their access to cutting-edge proprietary technologies, which ARTEC spent millions of dollars over a period of years developing.  Such confidential relationship was memorialized in the Employment Agreements and NCIAs entered into between ARTEC and the INDIVIDUAL DEFENDANTS.

260.   In addition, a confidential relationship existed between ARTEC and AXON, as memorialized in the Axon Agreement of August 8, 2012.  AXON's obligations to ARTEC survived the term of the Agreement.

261.   Until its discovery of the facts alleged herein, ARTEC believed implicitly in the integrity and truthfulness of the INDIVIDUAL DEFENDANTS and AXON, and each of them, and reposed absolute trust and confidence in each of them.

262.   Through the actions described herein to compete directly against ARTEC in the field of 3D facial recognition devices, the INDIVIDUAL DEFENDANTS, and each of

them, violated their confidential relationship with ARTEC by misappropriating ARTEC's Confidential Information and Trade Secrets and using it to develop and manufacture competing products via the newly formed corporations A-STAR and ID-WISE, including while they were physically continuing to work at ARTEC and for all intents and purposes holding themselves out as loyal employees.

263.    The INDIVIDUAL DEFENDANTS, A-STAR, and ID-WISE, and each of them, have continued to use ARTEC's Confidential Information and Trade Secrets in a manner designed to harm ARTEC's business relationships, reduce ARTEC's sales, and ultimately lower the value of ARTEC and of the stock held by ARTEC's officers and directors.

264.    In addition, A-STAR and AXON have been unjustly enriched by entering into an agreement through which A-STAR sold and shipped infringing products to AXON without authorization from ARTEC, for which AXON had agreed to pay, and on information and belief did pay, approximately $819,273 for 112 proprietary Broadway 3D devices.  AXON breached its ongoing commitments to ARTEC by entering into this Agreement.  On information and belief, AXON sold these products to end-users and profited by such sales.

265.    The actions taken to compete against ARTEC and to profit from the unauthorized sale of ARTEC Devices and devices based on Trade Secrets and Confidential Information by DEFENDANTS, and each of them, is wrongful.

266.    DEFENDANTS therefore hold such Confidential Information as an involuntary or constructive trustee for their own benefit or for the benefit of third parties with which they have become affiliated.

**COUNT FIFTEEN**

**False Advertising (Business & Professions Code § 17500)**

**(Against A-STAR, ID-WISE, and KLIMOV)**

267.    ARTEC re-alleges and incorporates by reference the allegations in paragraphs 1 through 266 above as if fully set forth herein.

268.    Section 17500 of the California Business and Professions Code ("Section 17500") renders it unlawful for any person, firm, corporation or association, or any employee thereof to with intent directly or indirectly "make or disseminate or cause to be made or disseminated before the public" in California or any other state "in any newspaper or other publication, or any advertising device, . . .  including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

269.    As set forth herein, A-STAR and ID-WISE, and each of them, have violated and are violating Section 17500.

270.    For example, A-STAR has falsely designated itself as the source of origin of ARTEC's Broadway 3D line of products, as well as other technology and proprietary software and hardware developed by ARTEC.

271.    For example, ID-WISE has made false claims via its website http://www.id-wise.com (which forwards to a website http://www.enter-face.com which is said to be "Powered by ID-Wise").  For example, the webpage http://www.enter-face.com/powered-by-id-wise/ states "Andrey Klimov, the leader of ID-WISE, . . . has been developing 3D sensing technology since 1999 and has patented numerous 3D solutions."  This statement is untrue or misleading, as any and all "3D sensing technology" was developed by and through ARTEC and/or other Artec Group companies, and any patents for 3D solutions were patented by ARTEC or other Artec Group companies.

272.    Similarly, the statement "We develop original, proprietary 3D sensing methods and base all products on that technology" is untrue or misleading because, on information and belief, any and all products and technology of ID-WISE are based on the Trade Secrets and Confidential Information belonging to ARTEC or Artec Group.

273.    In addition, on information and belief, A-STAR and ID-WISE, by and through KLIMOV and others, made untrue or misleading statements to AXON and other ARTEC business partners that A-STAR was connected with or one and the same with

1    ARTEC, that the Broadway 3D line of products was the property of A-STAR, and that A-

2    STAR and its representatives were authorized to sell the Broadway 3D line of products.

3         274.    Upon information and belief, these and other statements in A-STAR and ID-

4    WISE's websites, as well as printed materials disseminated to the public, contain false and

5    misleading representations and statements of fact concerning the origin of ID-WISE and

6    A-STAR technology and are in violation of Section 17500.

7         275.    ARTEC is informed and believes and thereon alleges that A-STAR and ID-

8    WISE, and each of them, knew or should have known that the advertisements were

9    misleading and untrue.

10        276.    ARTEC has been, and is likely to be further injured as a result of A-STAR

11   and ID-WISE's, and each of their, misrepresentations either by direct diversion of

12   customers and distributors from ARTEC to A-STAR and/or ID-WISE or other

13   competitors, or by the lessening of the goodwill which ARTEC and its industry-leading

14   products enjoy in the marketplace.

15        277.    ARTEC is informed and believes and on that basis alleges that A-STAR and

16   ID-WISE, and each of them, acted in bad faith by disseminating the false or misleading

17   statements set forth above.

18        278.    The acts and practices alleged herein are continuing to be practiced by A-

19   STAR and ID-WISE, and each of them, and will cause great and irreparable harm to

20   ARTEC and the public at large unless and until restrained by order of this Court.

21        279.    ARTEC has suffered and will imminently suffer further harm, including loss

22   of proprietary information and competitive position, the amount of which will be difficult

23   to ascertain.

24        280.    ARTEC will be without adequate remedy at law and is therefore entitled to

25   an injunction restraining A-STAR and ID-WISE, and each of them, as well as their

26   officers, agents, employees, and all persons acting in concert with them from publishing

27   unfair, deceptive, untrue or misleading advertising as alleged in this Complaint.

28

281.   As a direct result of the misleading and untrue public statements and advertising alleged herein, A-STAR and ID-WISE, and each of them, have been unjustly enriched in an amount not yet ascertained.  ARTEC is entitled to an accounting and restitution from A-STAR and ID-WISE, and each of them, in an amount to be determined at trial.

## COUNT SIXTEEN

### Unfair Competition (Business & Professions Code §§ 17200, et seq.)

### (Against All DEFENDANTS)

282.   ARTEC re-alleges and incorporates by reference the allegations in paragraphs 1 through 281 above as if fully set forth herein.

283.   ARTEC is informed and believes, and on that basis alleges, that the wrongful conduct of Defendants, and each of them, including but not limited to the tortious interference with the Employment Agreements and NCIAs of ARTEC employees; the misappropriation of ARTEC's Trade Secrets and Confidential Information, vendor and distributor information, and customer information; and the unauthorized manufacture and sale of devices or products identical or substantially similar to ARTEC Devices, *inter alia*, as alleged and set forth herein constitutes statutory unfair competition under California Business and Professions Code §17200 et seq.

284.   These acts and practices, as described in the preceding paragraphs, are unlawful and unfair and in violation of Section 17200.

285.   ARTEC is informed and believes, and on that basis alleges, that DEFENDANTS, and each of them, threaten and propose to perform further acts of unfair competition and that, unless and until restrained by appropriate injunctive relief, ARTEC will continue to suffer irreparable harm for which there is no adequate remedy at law.

286.   As a direct and proximate cause of DEFENDANTS', and each of their, unfair competition, DEFENDANTS have been unjustly enriched at ARTEC's expense in an amount not yet ascertained. ARTEC is entitled to an accounting and restitution from DEFENDANTS in an amount to be determined at trial.

1

**COUNT SEVENTEEN**

2

**Violation of Cal. Penal Code § 502**

3

**(Against KLIMOV)**

4      287.    ARTEC re-alleges and incorporates by reference the allegations in

5   paragraphs 1 through 286 above as if fully set forth herein.

6      288.    In or about October 2014, at KLIMOV's urging without ARTEC's

7   authorization, Parkhalin wrongfully utilized ARTEC's computer systems to transfer

8   computer files and data to KLIMOV.

9      289.    In addition, from October through February 2014, KLIMOV himself

10   accessed ARTEC's computer system to transfer computer files and data, including from

11   ARTEC's secured Redmine files.

12      290.    Through these actions, KLIMOV sought to extract confidential and

13   proprietary information from ARTEC and its computer networks for the purpose of

14   competing against ARTEC in the field of 3D technology.

15      291.    By so doing, KLIMOV did:

16         a.      Knowingly access and without permission use ARTEC's data,

17   computer, computer system, and computer network in order to wrongfully obtain

18   ARTEC's property and files.

19         b.      Knowingly access and without permission take, copy, and/or make

20   use of data from ARTEC's computer, computer system, and computer network.

21         c.      Knowingly and without permission access and cause to be accessed

22   ARTEC's computer, computer system, and computer network.

23      292.    These actions by KLIMOV caused damage to PLAINTIFF.

24      293.    KLIMOV is thus liable pursuant to Cal. Pen. Code § 502(e) for such

25   damages sustained by PLAINTIFF as a result of his unlawful activities identified in this

26   cause of action.

27

**V.      PRAYER FOR RELIEF**

28   WHEREFORE, ARTEC prays for relief as follows:

1.      That DEFENDANTS, and each of them, and their directors and officers, agents, servants, employees, attorneys, affiliates, distributors, consultants and any other persons in active concert or participation with them be preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above.

2.      That DEFENDANTS, and each of them, and their directors and officers, agents, servants, employees, attorneys, affiliates, distributors, consultants and any other persons in active concert or participation with them be preliminarily, and permanently enjoined from:

      a.      making any unauthorized use of ARTEC Trade Secrets and Confidential Information;

      b.      developing, manufacturing, selling or advertising for sale any hardware or software product that competes in the industry of 3D scanning and facial recognition technology, or which competes against ARTEC products including the Artec Broadway 3D line of products, Artec Studio 10, Artec Scanning SDK, Artec Shapify Booth, Artec Eva, and Artec Spider and Space Spider;

      c.      accessing, using, copying, publishing, disclosing, attempting to use or disclose, transferring, selling or otherwise distributing, directly or indirectly any of ARTEC's trade secrets, related information, confidential or proprietary business information, and/or any product or service developed with the use of, with reference to, derived from, or incorporating all or any part of ARTEC's Trade Secret and/or Confidential and Information; engaging in false, misleading and deceptive promotional activities that can or are likely to mislead members of the public as to the origin of products or services; encouraging or facilitating ARTEC's distributors to violate their agreements and continuing covenants with ARTEC; and using data or other information obtained from ARTEC by improper means; and

      d.      Hiding or destroying any documents or other evidence in any way concerning the allegations in this Complaint.

3.      That DEFENDANTS, and each of them, be directed to file with the Court and serve upon counsel for ARTEC, within thirty days after entry of judgment, a report in writing under oath setting forth in detail the manner and form in which DEFENDANTS have complied with the requirements of the injunction.

4.      A preliminary and permanent injunction ordering DEFENDANTS, and each of them, their directors and officers, agents, servants, employees, affiliates, distributors, consultants and any other persons in active concert or participation with them, to:

a.      assign all rights, title and interest in any material developed in reliance on Confidential Information or Trade Secrets to ARTEC;

b.      deliver and/or destroy any marketing material, advertisements, or other items that are untrue or misleading under Business & Professions Code § 17500;

c.      submit to forensic analysis any and all computer systems and electronic storage devices, including personal computers, personal email accounts, Skype accounts, Hangout sessions, handheld devices and/or USB or other drives, to determine the extent to which they possess or have possessed any of ARTEC's Confidential Information in any form; and

d.      return to ARTEC any property or information belonging to ARTEC; and destroy any and all copies of such information in their possession.

5.      That DEFENDANTS be directed to file with the Court and serve upon counsel for ARTEC, within thirty days after entry of judgment, a report in writing and under oath setting forth in detail an accounting of any and all sales, revenues, profit sharing or kick back payments DEFENDANTS made, obtained or distributed as a result of their actions in violation of ARTEC's rights described herein.

6.      That DEFENDANTS be ordered to deliver to ARTEC possession of:

a.      all ARTEC documents, computer files, designs, or other tangible ARTEC things, including but not limited to, those things which refer to, reflect, constitute, or in any way embody any of ARTEC's Trade Secrets and/or Confidential Information; and

1    b.  any and all things created, incorporating, referencing, based upon, or

2 derived from ARTEC's Trade Secrets and/or Confidential Information.

3    7.  That ARTEC receive such other injunctive relief as ARTEC may request and

4 the Court may deem just and proper.

5    8.  That DEFENDANTS show cause, if they have any, why they should not be

6 enjoined as set forth hereinabove during the pendency of this action.

7    9.  For disgorgement of any money, property, or the value of any other

8 economic benefit that Defendants, or any of them, have received as a result of their

9 unlawful conduct.

10    10.  That DEFENDANTS, and each of them, be required to account for all gains,

11 profits, and advantages derived from their acts of misappropriation and other violations of

12 law.

13    11.  That all gains, profits, and advantages derived from their acts of

14 misappropriation and other violations of law be deemed to be in constructive trust for the

15 benefit of ARTEC.

16    12.  For an order declaring that ARTEC is the sole owner of any software,

17 hardware, products, or designs, regardless of the stage of development, created by

18 DEFENDANTS, or any of them, in violation of law or contract.

19    13.  For an order requiring DEFENDANTS, and each of them, to disgorge profits

20 earned from their unlawful conduct.

21    14.  For an award of restitution, unjust enrichment, actual damages, liquidated

22 damages, statutory damages, and compensatory damages according to proof at trial.

23    15.  As for KLIMOV and KLIMOVA, disgorgement of their salary and any

24 additional compensation during the period in which they were in breach of their fiduciary

25 duties, which on information and belief started in August 2014 at the latest; invalidation of

26 the transfer or sale of KLIMOV's shares of ARTEC stock to any third party; disgorgement

27 of KLIMOV's shares of ARTEC stock; compensatory damages in an amount to be decided

28 at trial; and punitive damages.

16.     For attachment of KLIMOV's outstanding shares of stock to the extent that the value of such shares offsets the damages incurred by ARTEC.

17.     For aggravated damages.

18.     For punitive or exemplary damages.

19.     For interest as allowed by law.

20.     For costs of suit, including reasonable attorneys' fees, to the full extent permitted under law or contract.

21.     For such other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**FIRST AMENDED COMPLAINT FOR DAMAGES**
15-cv-03449-HRL

# VI.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), ARTEC hereby demands a jury trial for all issues in this case that properly are subject to a jury trial.

Dated:  January 15, 2016     Respectfully submitted,

By: /s/ Benjamin Davidson
Louise Ann Fernandez
An Nguyen Ruda
JEFFER MANGELS BUTLER & MITCHELL LLP
2 Embarcadero Center, 5th Floor
San Francisco, CA 94111
Telephone: (415) 984-9613
Facsimile: (310) 712-3364

Benjamin Davidson
LAW OFFICES OF BENJAMIN DAVIDSON, P.C.
9107 Wilshire Boulevard, Suite 450
Beverly Hills, CA 90210
Telephone: (310) 623-4423
Facsimile: (310) 432-0104

Attorneys for Plaintiff
ARTEC GROUP, INC.

COMPLAINT FOR DAMAGES