UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTEC GROUP, INC., <br> Plaintiff, <br> v. <br> ANDREY KLIMOV, et al., <br> Defendants. | Case No. 15-cv-03449-EMC <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION** <br> Docket No. 335 |

Plaintiff Artec Group, Inc. is a company that produces 3D scanning and recognition technology. Its flagship facial recognition product is the "Broadway 3D" line of devices. Artec filed suit against multiple companies and individuals, the majority of which were affiliated with Andrey Klimov, Artec's former CEO. According to Artec, Mr. Klimov, along with other "rogue" Artec employees, misappropriated Artec trade secrets and then set up two companies to compete with Artec. Those companies are ID-Wise SIA and A-Star LLC. Artec has settled its claims with the Klimov Defendants (*i.e.*, Mr. Klimov, the rogue employees, and ID-Wise and A-Star). Thus, the only claims remaining in this case are against a company not affiliated with Mr. Klimov – namely, Axon Business Systems.

Axon is a UAE company with whom Artec had a distribution agreement. Under the agreement, Axon would purchase Artec product from Artec and then resell the product to end users in the UAE. According to Artec, Axon bought Artec product (specifically, Broadway 3D devices) from A-Star, one of the Klimov Defendants. Axon also bought a competing facial recognition product (known as EnterFace) from ID-Wise, one of the Klimov Defendants. It is primarily these two actions that underlie Artec's claim that Axon breached the distribution agreement between the two companies.

Currently pending before the Court is a motion to reconsider filed by Axon. More specifically, Axon asks this Court to reconsider Judge Whyte's previous order denying Axon's motion to dismiss for lack of personal jurisdiction. Having considered the parties' briefs, the oral argument of counsel, and all other evidence of record, the Court hereby **GRANTS** the motion to reconsider and further dismisses Axon from the case for lack of personal jurisdiction.

## I.  FACTUAL & PROCEDURAL BACKGROUND

Judge Whyte was the original judge assigned to this case. In February 2016, Axon asked Judge Whyte to dismiss the claims against it for lack of personal jurisdiction. *See* Docket No. 85 (motion). In May 2016, Judge Whyte denied the motion. *See* Docket No. 104 (order). After Judge Whyte denied the motion, Axon filed a 12(b)(6) motion to dismiss. *See* Docket No. 125 (motion). Judge Whyte held a hearing on the motion, *see* Docket No. 143 (minutes), but the case was subsequently reassigned to this Court. In December 2016, this Court granted in part and denied in part Axon's 12(b)(6) motion. *See* Docket No. 157 (amended order). In essence, the non-contract claims against Axon were dismissed and the contract claims against Axon (*i.e.*, claims for breach of contract and breach of the implied covenant of good faith and fair dealing) were allowed to proceed.

Subsequently, in February 2017, Axon's counsel's moved to withdraw. *See* Docket No. 176 (motion). The Court ultimately granted the motion, *see* Docket No. 254 (order), and, in doing so, warned Axon that it would need to find new counsel to represent it and that, if it did not, then Artec could seek an entry of default and a default judgment. *See, e.g.*, Docket No. 225 (order). Axon did not find new counsel to represent it and thus its default was entered in June 2017. *See* Docket No. 259 (clerk's notice). Two months later, Artec filed its motion for entry of default judgment against Axon. *See* Docket No. 295 (motion).

In response, Axon asked for permission to file an opposition to the default judgment motion. (Axon's request was made by its former counsel.) The Court held that, before Axon could oppose the request for default judgment, it would have to first move to set aside the entry of default. *See* Docket No. 315 (order). Axon thus moved to set aside default (again, represented by former counsel), *see* Docket No. 320 (motion), and the Court granted the motion in September

2

2017. *See* Docket No. 327 (order). In that order, the Court took note of Axon's potentially meritorious defense on lack of personal jurisdiction. The Court added that, even if personal jurisdiction could not be contested, there appeared to be other potentially meritorious defenses.

Following the Court's order setting aside the default, the Court held a status conference in September 2017. At the conference, the Court set a schedule for Axon's motion to reconsider Judge Whyte's personal jurisdiction order. *See* Docket No. 329 (minutes). Artec and Axon subsequently had a settlement conference with Judge Laporte but the case did not settle. *See* Docket No. 334 (minutes). This Court must proceed with the motion for reconsideration.

Although personal jurisdiction is the issue before the Court, it is worthwhile to briefly touch on the substantive claims being brought by Artec against Axon.

The contract claims against Axon are based on the parties' distribution agreement, which they entered into in August 2012. The agreement specified that it "shall remain in effect for a period of one (1) year. Thereafter, the Agreement may be renewed for successive one (1) year terms, which renewal must be acknowledged in writing by ARTEC and [Axon]." Dist. Agmt. § 7.1. In its complaint, Artec does not dispute that the agreement was never renewed. Thus, the distribution agreement terminated in or about August 2013. Artec, however, claims breach of contract based on provisions of the agreement that it contends survive contract termination.[1] According to Artec, those provisions are: §§ 2.9, 2.11, and 7.5 of the agreement.

    (1) Section 2.9. Section 2.9 has two relevant provisions. First, Axon was barred from "**distribut[ing] equipment or products similar to or competitive with** [Artec's products] without ARTEC's prior written consent." Dist. Agmt. § 2.9 (emphasis added). Second, Axon had the duty to "keep ARTEC **informed** of [Axon's] current or future sales of equipment or products **similar to or competitive with** [Artec's

---

[1] In its motion for default judgment, Axon suggested a different theory in support of survival – namely, renewal of the distribution agreement by virtue of continued dealings between Artec and Axon. But that theory is problematic for several reasons. First, that is not the theory of survival that Artec pled in its complaint. Second, that position goes directly against § 7.1 of the agreement which provides that "renewal must be acknowledged *in writing* by ARTEC and [Axon]." Dist. Agmt. § 7.1 (emphasis added). Finally, continued dealings between Artec and Axon does not necessarily mean that *all* terms of the distribution agreement were thereby "renewed."

3

1 products]." Dist. Agmt. § 2.9 (emphasis added).

(2) Section 2.11. Section 2.11 provides in relevant part as follows: "[Axon] shall notify ARTEC promptly of any and all infringements, limitations, simulations, illegal uses, or **misuses of the ARTEC Marks, patents, and other intellectual property rights**." Dist. Agmt. § 2.11 (emphasis added).

(3) Section 7.5. Section 7.5 of the distribution agreement provides as follows: "Upon termination of this Agreement, Distributor shall immediately **cease all use** of the ARTEC Marks." Dist. Agmt. § 7.5 (emphasis added).

Artec claims that Axon breached the above provisions because, *e.g.*, after the contract terminated, Axon purchased Artec product (Broadway 3D devices) from A-Star (one of the Klimov Defendants); Axon did not inform Artec about A-Star's selling of Artec product; Axon purchased a competing product (EnterFace) from ID-Wise (another Klimov Defendant); and Axon did not inform Artec about the competing product.[2]

Per its motion for default judgment, Artec seeks both damages and injunctive relief based on the alleged misconduct by Axon. More specifically, Artec seeks: (1) $341,061.30 in compensatory damages (representing the profit that Artec would have made if Axon had bought the Broadway 3D product from Artec itself rather than A-Star) and (2) interest at the rate of $93.4415 per day (starting from the date of the distribution agreement, *i.e.*, January 7, 2015, and ending the date of judgment). As for injunctive relief, Artec seeks specific enforcement of the three contract provisions above (*i.e.*, §§ 2.9, 2.11, and 7.5).

## II. DISCUSSION

A. Legal Standard

As noted above, Axon is asking this Court to reconsider Judge Whyte's order denying Axon's motion to dismiss for lack of personal jurisdiction. *See* Docket No. 104 (order, filed on May 5, 2016).

---

[2] In its prior motion for default judgment, Artec suggested that the EnterFace product that Axon bought from ID-Wise may actually have been stolen Broadway 3D product that was simply "rebranded" as EnterFace. Apparently, Axon eventually sold the EnterFace devices to a third party, the Dubai Design District (also known as "D3").

4

In its papers, Artec contends that the reconsideration motion should be granted only if one of the following circumstances can be met:

    (1) At the date of Judge Whyte's order, a material difference in fact or law existed which Axon could not have discovered with reasonable diligence prior to the issuance of the order;

    (2) Since the date of Judge Whyte's order, new material facts emerged or a change in law occurred; or

    (3) Judge Whyte manifestly failed to consider material facts or dispositive legal arguments that were presented to him.

*See* Civ. L.R. 7-9(b). Artec criticizes Axon for failing to identify which prong above it is relying on in support of its motion for reconsideration and then concludes that Axon must be relying on (2) only because of its reliance on *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), which was issued after Judge Whyte's May 2016 order.

Artec's position is overly restrictive. While Axon may not have expressly identified which prong it is moving under, fairly construed, its brief reflects that it is implicating both prongs (2) and (3) above. To the extent Artec contends that Axon may not invoke prong (2) because *Bristol-Myers* is not a change in the law, the Court again is not persuaded. Nothing requires that there be a sea change in the law in order to justify reconsideration. While not every incremental change in or refining, clarification, or fine tuning of the law may be enough to warrant reconsideration, the Court is satisfied that the requisite threshold has been passed here. *Bristol-Myers* is part of a continuing trend in Supreme Court authority placing less significance on a defendant's contacts with a plaintiff who happens to reside in the forum state as opposed to the defendant's contacts with the forum state itself. *See, e.g.*, *Walden v. Fiore*, 134 S. Ct. 1115, 1122-23, 1126 (2014) (stating that "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with the persons who reside there"; acknowledging that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties" but the "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction"); *Bristol-Myers*, 137

5

S. Ct. at 1781-82 (emphasizing that "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State; accordingly, focus on where the "relevant conduct" took place, not just the fact that the conduct affected plaintiffs with connections to the forum state) (internal quotation marks and emphasis omitted). Moreover, reconsideration is warranted because Judge Whyte's order failed to consider material facts such as whether certain contract provisions did in fact survive termination as well as dispositive legal arguments.

B. Specific Jurisdiction

In the instant case, Artec makes no claim that this Court has general jurisdiction over Axon; accordingly, the Court need only examine whether there is specific jurisdiction. Under Ninth Circuit precedent, there is a three-prong test for analyzing a claim of specific personal jurisdiction.

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). In the case at bar, the critical prong is the first one.

With respect to prong (1), because the claims at issue in the instant case are based on contract, the Court applies a purposeful availment analysis. *See id.* (stating that "[a] purposeful availment analysis is most often used in suits sounding in contract"). In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court emphasized that the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Id.* at 475. The Court added that

> [j]urisdiction is proper . . . where the contacts proximately result from *actions by the defendant himself* that create a "*substantial connection*" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 475-76 (emphasis omitted and added). *Burger King* went on to emphasize that "an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum." *Id.* at 478 (emphasis in original). Rather, a court must follow

> a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Id.* at 479.

In *Burger King*, the Court held that there was "substantial record evidence supporting the District Court's conclusion that the assertion of personal jurisdiction over [the defendant] in Florida for the alleged breach of his franchise agreement did not offend due process." *Id.* at 478. The "franchise dispute grew directly out of 'a contract which had a substantial connection with [Florida]." *Id.* at 479. For example, the defendant "deliberately '[reached] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise" – "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 479-80. The Court added that a Florida choice-of-law provision in the contract standing alone was not sufficient to confer jurisdiction but, "when combined with the 20-year interdependent relationship [the defendant] established with Burger King's Miami headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482.

Subsequently, the Supreme Court underscored the fact that the plaintiff's residence in the

7

forum state is in itself insufficient to establish personal jurisdiction, but that a contractual relationship that envisions continuing and wide-reaching contacts in the forum state can. *See Walden*, 134 S. Ct. at 1122 (noting that, in *Burger King*, the Court "upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by . . . entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State").

In the instant case, Artec has failed to establish the requisite minimum contacts to support even a prima facie case of personal jurisdiction. *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (stating that where a court "receive[s] only affidavits or affidavits plus discovery materials" in conjunction with a motion to dismiss for lack of personal jurisdiction, a plaintiff "must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss"). Admittedly, Axon did contract with Artec, and Artec is a California company. But there is no dispute that it was Artec, not Axon, who reached out to establish a contractual relationship; the negotiations resulting in the contract (*i.e.*, the distribution agreement) did not take place in California; the product that Axon purchased from Artec ultimately came from Europe, not California; the primary performance contemplated by the contract (*i.e.*, Axon's distribution of Artec product) was to take place outside of California (*i.e.*, distribution of the product would be in the UAE).[3] Moreover, the parties' contract had terminated by the time of alleged breach, thus leaving a significantly pared-down relationship between the parties with only limited contract terms surviving. It is also undisputed that the alleged breaches of the surviving contract terms (*i.e.*, the purchase by Axon of products from A-Star and ID-Wise) took place after the contract terminated and outside of California.

---

[3] *Cf. Picot*, 780 F.3d at 1213 (acknowledging that defendant made two trips to California after entering into the alleged oral contract with plaintiff; but stating that the trips were not envisioned in the initial agreement and, in any event, the trips held no "special place in [the defendant's] performance under the agreement as a whole" – the "bulk" of the defendant's contractual efforts were centered in Michigan); *Sungard Data Systems, Inc. v. Central Parking Corp.*, 214 F. Supp. 2d 879, 882-83 (N.D. Ill. 2002) (stating that the contract at issue was not substantially connected to Illinois because "[t]he business that [the defendant] contracted to protect was not in Illinois" and,"[l]ike an insurance contract, which is centered on the insured property, [the] contract for business continuity services was centered on [defendant's] business in Tennessee").

8

1    Hence, unlike *Burger King*, here, at the time of the alleged breach, Axon had no continuing and
2    wide-ranging contacts with California.

3    Artec argues that the parties' distribution agreement did in fact contemplate continuing and
4    wide-reaching contacts in California because the agreement contained a California choice-of-law
5    provision; the contract priced products in U.S. currency; notices from Axon to Artec were to be
6    mailed to Artec in California; and because – even though the contract terminated – certain contract
7    terms survived termination. Artec underscores that these terms, taken collectively, are sufficient
8    to support a prima facie case of jurisdiction, as Judge Whyte concluded.

9    The choice-of-law and U.S. currency provisions, while deserving of consideration, do not
10   drive the analysis. *See, e.g.*, *Burger King*, 471 U.S. at 482 (stating that a Florida choice-of-law
11   "provision standing alone would be insufficient to confer jurisdiction" but, "when combined with
12   the 20-year interdependent relationship [defendant] established with Burger King's Miami
13   headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable
14   foreseeability of possible litigation there"). In addition, while the distribution agreement specified
15   that future notices should be mailed to Axon's headquarters in California (§ 11.11[4]), that contact
16   with California largely rests on the happenstance that Artec is a California company.[5] *See Burger
17   King*, 471 U.S. at 475 (stating that the "purposeful availment' requirement ensures that a
18   defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or
19   'attenuated' contacts"); *Walden*, 134 S. Ct. at 1122 (stating that the "'minimum contacts' analysis
20   looks to the defendant's contacts with the forum State itself, not the defendant's contacts with
21   persons who reside there"). In *Bristol-Myers*, the Court underscored that, in *Walden*, the Nevada
22   court did not have specific jurisdiction over the defendant "[b]ecause the '*relevant* conduct
23   occurred entirely in Georgi[a] [and] the mere fact that [this] conduct affected plaintiffs with
24   connections to the forum State d[id] not suffice to authorize jurisdiction.'" *Bristol-Myers*, 137 S.

---

[4] Section 11.1 provides: "Any notice required by this Agreement shall be in writing and sent by [specific means] to the addresses noted below. [¶] If to ARTEC: Artec Group, Inc. 4370 La Jolla Village Drive, San Diego, CA 92122." Dist. Agmt. § 11.1.

[5] In his order, Judge Whyte did not acknowledge this point.

9

Ct. at 1781-82 (emphasis in original).

Artec's position that the surviving (*i.e.*, post-termination) contract terms established a relationship that envisioned continuing and wide-reaching contacts in the forum State is misplaced. As an initial matter, Artec has failed to make out a prima facie case that all of the terms that Artec claims survived termination of the contract did in fact survive.[6] In particular, Artec has not shown that the relevant provisions of § 2.9 of the parties' distribution agreement survive. As noted above, § 2.9 has two relevant provisions. First, Axon was barred from "distribut[ing] equipment or products similar to or competitive with [Artec's products] without ARTEC's prior written consent." Dist. Agmt. § 2.9. Second, Axon had the duty to "keep ARTEC informed of [Axon's] current or future sales of equipment or products similar to or competitive with [Artec's products]." Dist. Agmt. § 2.9. However, § 7.2 of the distribution agreement which governs survival with respect to § 2.9 provides: "The restrictions *on the use and dissemination of Confidential Information* stated in Sections 1.1 and 2.9 shall survive the termination of this Agreement." Dist. Agmt. § 7.2 (emphasis added). As made clear by the express language of § 7.2, only § 2.9's restriction on the use and dissemination of confidential information survives – § 2.9's bar on distribution of competitive products and notice requirement, the ban allegedly violated by Axon, have nothing to do with confidential information,[7] and does not fall within the

---

[6] As above, in his order, Judge Whyte did not acknowledge this point.

[7] The Court also notes that § 2.9's bar on distribution of competitive products is arguably an unlawful restraint on trade. California Business & Professions Code § 16600 provides in relevant part: "[E]very contract by which *anyone* is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600 (emphasis added). "Anyone" seems to include businesses (*i.e.*, non-individuals). *See, e.g.*, *Getz Bros. & Co. v. Fed. Salt Co.*, 147 Cal. 115 (1905) (in a case involving two companies, stating that "we entertain no doubt" that the "covenants are illegal as being in restraint of trade, against the express mandate of the law of this state," *i.e.*, the predecessor statute to § 16600); *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1293 (9th Cir. 2009) (holding that arbitrator's ruling that there was a valid covenant not to compete with respect to two companies ignores § 16600 and thus "is in manifest disregard of the law").

Axon previously relied on § 16600 in arguing for dismissal under Rule 12(b)(6). The Court did not grant Axon's 12(b)(6) motion in that regard but neither did it foreclose the § 16600 defense. The Court simply stated that it was "not clear from the allegations in the complaint whether or not the [distribution agreement] was in term (*i.e.*, still in effect) at the time of the alleged breach." Docket No. 157 (Order at 5). Now, it is clear from Artec's prior motion for default judgment that the distribution agreement had been terminated by the time of the alleged

scope of § 7.2's survival provision.

This leaves only § 2.11 and § 7.5 as terms that allegedly survived contract termination. Section 2.11 requires Axon to notify Artec of any misuse of Artec's intellectual property rights; § 7.5 bans Axon from using Artec marks post-termination of contract. Even if these terms survived contract termination, they are not enough to establish a substantial connection between Axon and California. These are not continuing and wide-ranging contacts with the forum state comparable to the on-going twenty-year franchise relationship in *Burger King*. *See Burger King*, 471 U.S. at 475-76. In fact, § 7.5 has no apparent connection to California at all other than the fact that Artec is a California company and thus contact with the forum state is fortuitous. As for § 2.11, as noted above, any required notice to Artec in California is not only a fortuitous contact with California, but something that is at best contingent, not continuing, absent any expectation that notices would need to be regularly provided. Moreover, the act of giving notice would originate from Axon outside of California; its failure to do so involved an omission (not an affirmative act) occurring outside of California.

These slender reeds upon which Artec's claim of jurisdiction rests, even when viewed collectively with the choice-of-law provision, the U.S. currency term, and the general notice provision, do not establish the requisite minimum contacts. *Cf. Vista Food Exch., Inc. v. Champion Foodservice, L.L.C.*, 2014 U.S. Dist. LEXIS 108145, at *14 (S.D.N.Y. Aug. 4, 2014) (noting that "[c]ourts may also consider choice of law clauses and whether the contract requires parties to send notices and payments into the forum state" as well as telephone calls and other communications to the forum state but indicating that such "must be evaluated with an eye towards whether a defendant has 'purposefully availed himself of the privilege of conducting activities in [the forum state] and thereby invoked the benefits and protections of its laws'"); *see also Burger King*, 471 U.S. at 465-66, 480 (noting, *inter alia*, that "[t]he governing contracts

---

breach. The Court also stated that "whether a provision operates as 'a restraint of substantial character' . . . is a fact-intensive inquiry" that should not be decided at the 12(b)(6) phase. Docket No. 157 (Order at 5). But, as indicated above, the facts now seem to be established; Artec's motion for default judgment makes clear that it takes the position that it can indefinitely restrict Axon from distributing competitive products even after their distribution agreement has terminated.

11

provide that the franchise relationship is established in Miami and governed by Florida law, and calls for payment of all required fees and forwarding of all relevant notices to the Miami headquarters" but placing such within the context of "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida" based on the franchisor-franchisee relationship); *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (stating that defendant "must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state,'" such as conducting prior negotiation and conduct which engenders contemplated future consequences within the state).[8]

### III. CONCLUSION

Accordingly, the Court grants Axon's motion to reconsider and concludes that Artec has failed to establish a prima facie case of personal jurisdiction over Axon. The Court thus dismisses Axon from this case.

Because Axon is being dismissed from this case and Artec has settled with the remaining defendants (*i.e.*, the Klimov Defendants), it would appear that this close may be closed and a final judgment entered as to Axon. Out of an abundance of caution, however, the Court shall give Artec an opportunity to file a statement as to why this case should not be closed and/or why final judgment as to Axon should not be entered. Artec shall file any such statement by November 29, 2017.

This order disposes of Docket No. 335.

**IT IS SO ORDERED**.

Dated: November 22, 2017

_____
EDWARD M. CHEN
United States District Judge

---

[8] At the hearing, Artec argued fair play and substantial justice mandates a finding of personal jurisdiction here because this is the only forum available to Artec to sue Axon. Not only has Artec misstated the legal analysis – the analysis of fair play and substantial justice comes into play only *after* minimum contact is found, *see Schwarzenegger*, 374 F.3d at 801-02 – Artec offers no proof that it could not have sued Axon in some other international or foreign forum. Moreover, it should be noted that Artec could have bargained for a choice of venue clause in its distribution agreement with Axon had it been concerned about a lack of available forum other than a U.S. court.